GEORGE F. MUNRO *v.* ELIJAH MERCHANT.

H. M., the elder, was born in Scotland, and at an early day came to reside in the colony of New York, and lived near Fort Miller, when he received a conveyance of certain lands from W., L. & V. in 1774. Shortly afterwards, and just before the commencement of the revolutionary war, he went to Montreal, and always afterwards resided in Canada, until his death, in 1802. *Held*, that he was an alien, as regards the state of New York, from the time of the establishment of an independent government here, until his death.

H. M., the younger, son of H. M. the elder, was born in New Jersey, in about 1766; went with his father's family to the neighborhood of Fort Miller, and was left there with his mother and the remainder of the family when his father went to Canada. At the commencement of the revolutionary war his mother went with her family, consisting of this son and four other young children, to the city of New York, where, and on Long Island, then also in the possession of the British army, they, or the survivors of them, remained until the close of the war. The mother and all the children, except this son, appeared to have died during the war. He was with an aunt on Long Island, at the peace, and was then sent for by his father to come to him in Canada, whither he accordingly went, being then about 17

years of age; and he had ever since resided in Canada, in the same town, with his father, whose property there he inherited.

*Held,* that H..M. the younger was, equally with his father, born a British subject; that he did not become a citizen of New York by force of the declaration of independence, or of the act of the convention of July 16, 1776, affirming that all persons abiding within the state and deriving protection from the laws of the same owed allegiance to the said laws and were members of the state; because, independently of his minority, he withdrew, or was withdrawn from the place where those laws practically operated, and was placed under the protection of the British government, in a locality possessed by its armies and wholly under its control. Nor did he become a citizen of New York by force of any election to abide therein, after the British forces were withdrawn, upon the conclusion of the peace, for the reason that he was incapable, from his non-age, of making an actual election, and did not attempt to do so; and that if he did remain here for a short time after the treaty, no election could be inferred from that circumstance, on account of the same disability; especially as he conformed to the directions of his father, a British subject, by repairing to a British colony, at once; and hence that he also was an alien.

*Held, also,* that notwithstanding his alienage, H. M. the younger could inherit from his father, who was never attainted of treason, the lands held by the latter in this state, by force of the treaty of peace, of 1783, and the subsequent treaty of commerce, of 1794.

A deed purporting to be executed by virtue of a power of attorney from the owner of the land, which power is not proved, affords sufficient color of title on which to found an adverse possession, if there has been a good constructive occupation, under it.

Where a grantee of a large tract of uncultivated land entered upon the same, in 1797, under and by virtue of his deed, and made extensive, valuable and permanent improvements, erected buildings, and paid taxes thereon; the cleared portion being continuously occupied by him and his successors in the title, and by his and their lessees and tenants, down to the present time, under a claim of title to the whole tract; and the uncleared portion of the land having been extensively used for cutting timber for the market, and for fencing and fire wood; *Held,* that in the absence of any subordinate allotment which would limit the effect of such entry and possession, the whole of the premises included in the deed were, by force of the 9th section of the article of the revised statute relative to the time of commencing actions relating to real property, (2 *R. S.* 294,) to be deemed to have been held adversely to persons claiming to hold under a subsequent deed.

The provisions of that article of the revised statutes were not intended to introduce a new rule, applicable only to future cases, but are declaratory of the then existing law.

A child born here, of non-resident parents, and now residing here, is *prima*

Statement of Case.

*facie* a citizen of this state, notwithstanding his mother was only here for the purpose of being confined.

An alien may take by purchase, and hold against all parties except the state claiming under an inquest of office.

APPEAL from the Supreme Court.(*a*)    The action was ejectment, brought to recover a part of lot No. 2 of the 20th allotment of the Kayaderosseras patent.    The land embraced in that tract was granted by Queen Anne to Rip Van Dam and twelve other persons, by letters patent dated November 2, 1708.    Both parties claimed under title derived from Van Dam.    There had been a partition of the patent by commissioners acting under a colonial statute, in the year 1769, but the court held that there was a defect in the proof requisite to show its validity, and the plaintiff's claim was therefore limited to an undivided thirteenth part of the parcel to which his title extended; and as he did not appeal, no question is now made respecting the partition.    The complaint was for the north half of lot No. 14 on a map of the Gansevoort estate, which lot was alleged to lie within great lot No. 2 above mentioned; but the proof showed that only $16\frac{18}{100}$ acres of said lot No. 14 lay within that great lot, and hence the plaintiff's claim, and the judgment which he recovered, was further limited to an undivided one thirteenth part of those $16\frac{18}{100}$ acres.

The plaintiff's deduction of title was as follows:    (1.) The will of Rip Van Dam, by which a power was given to his three executors, or the survivors or survivor of them, to sell and convey all his real estate not specifically devised.    (2.) A deed from Robert Livingston, jun., described as surviving executor of the above named testator, to Jacob Walton, Isaac Low and Anthony Van Dam, dated October 24, 1771, conveying all the testator's interest in the Kayaderosseras patent.    To prove the death of the other two executors, Isaac Van Dam and Thomas Moore, prior to the date of this deed, the plaintiff gave in evidence, against the defendant's objec-

(*a*) S. C., 26 Barb. 383.

tion, exemplified copies of their respective wills, and of letters of administration granted thereon, said letters being of the dates of May 7, 1750, and November 1, 1756, respectively. (3.) A deed from Walton, Low and Anthony Van Dam to Hugh Monro, dated August 30, 1774, conveying the said lot No. 2 of the aforesaid patent, with the exception of two parcels specified, but which are not material to the present question. These two deeds were proved by exemplifications of the record thereof. (4.) The death of Hugh Monro, the last named grantee, intestate, in the year 1802, at Edwardsburg, in Canada, leaving his son, Hugh Monro, his only surviving descendant. (5.) A judgment in the Supreme Court recovered in the year 1852, against the last mentioned Hugh Monro, in an action brought by him against Peter Gansevoort, in which the defendant had judgment in his favor, and costs. It was shown that said lot No. 2 was sold on execution upon the judgment, and that the plaintiff in the present action, a son of the judgment debtor, acquired the title of the purchaser by redemption upon a subsequent judgment confessed in his favor by said debtor, and that he received the sheriff's deed.

The defendant gave in evidence a deed from Anthony Van Dam, by Gerard Walton his attorney, to Peter Gansevoort, jun., dated June 17, 1797, for the premises in question, but no power of attorney to Walton was proved. It was shown that Isaac Low, one of the grantees of Robert Livingston, jun., was attainted of treason by an act of the legislature of New York, passed October, 1779. It was further proved that Peter Gansevoort, jun., died in 1812, having by his will devised the premises to Catharine Gansevoort, his wife, who died about 1831, having devised her real estate to her executors, Herman and Peter Gansevoort, in trust to sell. They conveyed the premises in question, among other lands, to Ransom Sutfin and others in January, 1841, who conveyed the north half of lot No. 14 on said map, embracing said premises, to the defendant, in 1848.

The defendant also gave in evidence, from the original book of registry of mortgages preserved in the clerk's office of the county of Albany, the registry of a mortgage purporting to have been executed by Hugh Monro to Jacob Walton, Isaac Low and Anthony Van Dam, September 1, 1774, by which the mortgagor is described as of the precinct of Saratoga, in the county of Albany. It is conditioned for the payment of 355 pounds 10 shillings lawful money of the province of New York, in one year from date, with lawful interest, and conveys, by way of mortgage, the same premises described in the above mentioned deed from Walton and others to said Munro. Proof was also given to show the alienage of Hugh Munro, father and son, and of the plaintiff. Objections were taken by the plaintiff's counsel to the reception of the evidence of the mortgage, which are sufficiently stated in the opinion. The defendant also gave evidence to sustain the defense of adverse possession, which evidence is also referred to in the opinion.

Various objections were also taken by the defendant's counsel in the course of the trial, and upon a motion for a nonsuit made and denied at the conclusion of the plaintiff's evidence. The court directed a verdict for the plaintiff, subject to the opinion of the Supreme Court at a general term, the defendant insisting that the evidence of adverse possession, and the presumption of a conveyance from the plaintiff, or those under whom he claims, should be submitted to the jury. The defendant's counsel excepted, and a verdict was rendered accordingly. The general term held that the plaintiff was entitled to recover as above mentioned, and from that judgment the defendant brought this appeal.

*W. A. Beach,* for the appellant.

I. Granting that the plaintiff is entitled to recover at all, he has shown title only to an undivided thirteenth of the premises in dispute. He fails to prove a legal partition of

the patent of Kayaderosseras, under the act of 1762. This proposition was sustained by the decision below, and is acquiesced in by the respondent.

II. The title of the plaintiff is inoperative and void by reason of the alienage of those through whom he claims. *First.* Hugh Munro the elder, the grandfather of the plaintiff, was of Scottish descent. He removed to Canada just before the revolutionary war, and remained there until his death in 1802. Immediately before the commencement of hostilities, and doubtlessly in anticipation of them, he abandons his · residence and family, adheres to his English allegiance, and without business employment remains under British jurisdiction until his death, some five years after the treaty of peace. He was therefore an alien, and unquestionably a tory refugee. Had he been a native of this country, his flight prior to the establishment of our independence, and continued absence under a hostile allegiance until his death, would have rendered him an alien. (*Orser* v. *Hoag*, 3 Hill, 79, 81, 82; *Inglis* v. *Trustees &c.*, 3 Peters, 99, 121; 2 *Kent's Com.* 40, 41.) *Second.* Hugh Munro 2d, father of the plaintiff, was an alien. He was born in 1766 and previous to September of that year. The precise date of his birth is not given, but it appears, that when his deposition was taken in September, 1855, he was eighty-nine years old and upwards. He removed to Canada when sixteen or seventeen years old. If he was full seventeen, his removal from the United States was just prior to the treaty of peace, September 3, 1783, and in the same year. The general statement in his deposition, that he left a year or two after the close of the revolutionary war, is incorrect. The time of his birth, and his age when he removed to Canada, are decisive upon this point. He was, therefore, an alien, though born within the United States. He was born a British subject, and remains such unless he elected to become an American citizen. "As a general rule, the character in which the American *ante nati* are to be considered, will depend upon, and be determined by

the situation of the party, and the election made at the date of the declaration of independence, according to our rule; or treaty of peace, according to the British rule." (3 Peters, 181; 3 Hill, 83.) In *Peck* v. *Toucey*, (26 Wend. 621, 622,) Chancellor WALWORTH evidently considers the close of the war as the period at which the election is to be determined. If so, and regarding the party as an adult, the removal to Canada prior to the treaty of peace was an election to continue a British subject. It was an unequivocal adhesion to the cause of the enemy, and a disclaimer of American citizenship. This rule is, however, inapplicable to Hugh Munro 2d, from his inability to elect his allegiance. He was an infant *ante natus*, and at no time during his continuance in the United States capable of such election. His citizenship must therefore be determined by his conduct after arriving at full age. At seventeen years of age he left the country, at the call of his father, and has remained ever since and still abides under British rule. The election thus made for him by his father, he thereby ratified. The ratification relates back, and has the same effect, as if the election had been effectually made by himself at the time of his removal. (3 Peters, 123, 126.) *Third.* Hugh Munro, the son, could not therefore, at common law, take title to the land in question, as heir to his father. Although an alien could hold under grant or devise, subject to forfeiture to the state, he could not either transmit or acquire title by descent. Hence the plaintiff took nothing by his purchase under the execution against his father. (*Jackson* v. *Adams*, 7 Wend. 367; *The People* v. *Irvin*, 21 id. 128; *Wadsworth* v. *Wadsworth*, 2 Kern. 376, 380; *Wright* v. *Sadler*, 20 N. Y. Rep. 320, 324.) *Fourth.* Nor can the plaintiff claim as heir of Hugh Munro the elder, under the rule, that an "alien can not interrupt the descent to others, and the inheritance descends to the next of kin who is competent to take, in like manner, as if no such alien existed." This doctrine applies, only where "the claimant does not make title through the alien," but can deduce ped-

igree from the person dying seised, by leaving out, or passing by the alien. (*McLean* v. *Swanton*, 3 Kern. 535.) *Fifth*. The treaties between the United States and Great Britain, of 1783 and 1794, did not enable Hugh Munro the 2d, to inherit the lands in dispute. The provisions applicable are as follows:

Article VI, 1783. "That there shall be no future confiscations made, nor any prosecutions commenced against any person, or persons, for, or by reason of the part which he, or they may have taken in the present war; and that no person shall, on that account, suffer any future loss, or damage, either in his person, liberty, or property; and that those who may be in confinement on such charges, at the time of the ratification of the treaty in America, shall be immediately set at liberty, and the prosecutions so commenced shall be discontinued."

Article IX, 1794. "It is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his majesty, shall continue to hold them according to the nature and tenor of their respective estates and titles therein; and may *grant, sell or devise* the same to whom they please, in like manner as if they were natives; and that neither they, nor their heirs or assigns, shall, so far as may respect the said lands and the legal remedies incident thereto, be regarded as aliens." (*a.*) Although the treaty of 1783 gave British subjects, within its description, capacity to transmit lands by descent, it must nevertheless be to a citizen. (*Brown* v. *Sprague*, 5 Denio, 545.) (*b.*) That of 1794 does not remedy the objection. It supplies a defect in the preceding treaty, and enables an alien then holding lands, to *grant, sell or devise*, not to transmit by descent. The latter power existed under the treaty of 1783, but with the limitation that the descent must be to a citizen. The latter branch of Article IX does not enlarge the previous declaration of power. It is but cumulative and confirming, authorizing heirs and

assigns, to take by grant or devise, notwithstanding the alienage of the grantor or devisor. The only object was to confer upon the then alien holder, the full rights of citizenship, as regarded such lands, with power to grant, sell or devise, and nothing more. It certainly was not meant to exalt the British subject above an American citizen, in his capacity to transmit American soil, so that an alien heir could take by descent from an alien, while he could not from a citizen. Nor was it intended to perpetuate alien claims within the Union, so that all tory titles existing at the treaty might be indefinitely continued in non-resident foreigners. Alien heirs can not inherit from native citizens. It would be a singular anomaly, if nevertheless, an alien may inherit from an alien, to the end of time. (c.) The construction of the treaty of 1794 is not controlled by the decision in the case of the *Duke of Cumberland* v. *Graves*, (3 Seld. 305.) That arose under the statute of 1798, the phraseology of which clearly indicates the intent of the legislature to enable alien heirs not only to inherit, but to transmit the estate. (d.) The general doctrine, that the division of an empire works no forfeiture of a right previously acquired, is inapplicable to this case. At the time of the revolution there was no existing right. Hugh Munro the elder, was then a British subject, undoubtedly a tory refugee. He was a non-resident, having no privilege of citizenship, nor had his descendants any then existing rights through him. All, either can claim, must come through the benevolence of the treaties of 1783 and 1794. (*Kelly* v. *Harrison*, 2 John. Cas. 29, 32; *Orsed* v. *Hoag*, 3 Hill, 79.) (e.) The alien statutes of 1798 and 1819 apply only to *conveyances thereafter made*. Those of 1802 and 1808 are limited to aliens who became inhabitants of this *state*, as distinguished from the *colony*. And they are merged in the act of 1825 or subsequent statutes, none of which influence the question at bar. (Laws of 1825, p. 427; 2 R. S. 3d ed. p. 4, §§ 16, 18; Laws of 1834, ch. 272; *Kennedy* v. *Wood*, 20 Wend.

230.) The act of 1843, chap. 87, reaches only naturalized citizens, who have previously acquired land. And it only relieves the disability of the party claiming its benefit. It does not enable him to inherit, when the obstacle arises from the alienage of an ancestor. (*Redpath* v. *Rich*, 3 Sand. 79.)

III. The defendant has established perfect title by adverse possession. It commenced in 1797 under an entry by Peter Gansevoort, jun., claiming by deed from Anthony Van Dam, by his attorney Gerard Walton. This title and corresponding possession was traced by regular deduction to the defendant. The evidence shows that the tract occupied by Peter Gansevoort, jun. comprised about 1500 acres, of which upwards of 200 acres were cleared, fenced and cultivated in the year 1800. He built a saw mill and grist mill and various dwellings, conducting quite extensively the lumbering and agricultural business, as well as a grist mill. He and his successors uniformly claimed title, exercising the usual acts of ownership. They cultivated, paid taxes, performed highway labor, leased portions of their premises and annually cut wood and timber over the whole tract. It was occupied as one lot, or known farm, until after 1833, when it was subdivided. It appeared that, during the present century, it had not been the custom in that section of the country to fence timber lands. *First.* The deed from Gerard Walton, as attorney, was a sufficient basis for an adverse possession, without further proof of the death either of Low or Van Dam. Low was attainted in 1779; he was *civiliter mortuus.* The recital in the deed of the power of attorney to Walton, after so great lapse of time and continued possession, under the deed, is sufficient proof of authority. (*Doe* v. *Phelps*, 9 John. 169; *Doe* v.*Campbell*, 10 id. 479.) *Second.* It, at any rate, gives abundant *color of title*, upon which to construct an adverse possession. There is claim of title under a written instrument. *Third.* Conceding that Peter Gansevoort, jun. had notice of an outstanding claim to the lands covered by his deed, either on the part of Hugh Munro, or the state, or both, he and his

descendants might nevertheless claim adversely. *Bona fides* is not requisite to adverse possession. (1.) The statute demands no such ingredient. It constitutes a possession adverse, which is accompanied by claim of title, exclusive of every other right, founding such claim upon some written instrument. Whatever may have been the common law rule, the statute requirements are unequivocal and exclusive. The whole doctrine of adverse possession was reduced to statutory definitions to avoid, as far as practicable, the confusion and perplexity of existing jurisprudence. The certainty of the statute can not, therefore, be safely departed from. (2.) The cases of *Jackson* v. *Hill*, (5 Wend. 532,) and *Livingston* v. *Peru Iron Co.*, (9 id. 511,) are not sustained by subsequent adjudications. It may be regarded as settled upon authority, that however wrongful or fraudulent the possession, or defective the title, an entry under claim of exclusive title, founding such claim upon a written conveyance, accompanied by a continued possession of twenty years, constitutes an effective adverse possession. (*Humbert* v. *Trinity Church*, 24 Wend. 587, 602, 604, 609, 611, 613; *Northrop* v. *Wright*, 7 Hill, 476; *Bogardus* v. *Trinity Church*, 4 Sand. Ch. 633, 712, 738; *Burhans* v. *Van Zandt*, 7 Barb. 91, 101.) (3.) The entry and possession of Gansevoort was, however, in undoubted good faith. He had no notice of the claim of Munro. If chargeable with knowledge of the claim of the state under the attainder of Low, the circumstance would not affect his *bona fides*. But his deed is with covenants, and assumes to convey the whole title by the survivor of joint tenants, reciting the death of co-tenants. He pays a large consideration, and at once makes costly erections on his purchase. It is quite apparent that he had no knowledge or suspicion of any defect in his title. *Fourth.* The possession of the premises in dispute, by Gansevoort and his successors, has been of the character and for the time required by the statute. (1.) It falls within the third subdivision of section 83, in two of its aspects. The land has been used

for the supply of fuel, and for the ordinary use of the occu-pants, and for lumbering, which was the "ordinary use" of that early period. (2.) It is also embraced by the fourth subdivision of the same section. It was a known farm, partly improved, with a portion left uncleared and uninclosed according to the custom of the adjoining country. (*a.*) The tract occupied by Gansevoort was a known farm. It was occupied together and known as the Gansevoort farm for more than half a century. It was a *farm*, though embracing large quantities of timber land used for lumbering; and the occupants were *farmers*, though uniting the occupation of lumbermen. In the early settlement of the country the two pursuits were identical. The farmer was of necessity a lumberman. It is the same still, in the less populous inland districts. That a portion of a known farm is dedicated to lumbering does not affect its character, so long as it corresponds with the customs of the country. The question is not to be determined by any technical definition of a farm, or farmer, but by the habits and sentiments of the particular locality. (*b.*) Under this subdivision four, three things only are required: A known farm, part improvement, the residue uncleared and uninclosed in accordance with surrounding custom. It is not necessary to lumber, cut fuel or fencing timber, or practice any other act of ownership. The evidence in the case at bar certainly establishes this character of possession. (*c.*) The history of legislation on this subject shows that it was the design of the legislature to leave the question, as to the quantity of land which might be possessed under the statute, to the custom of the locality. The revisors, in their report, proposed a maximum limit of 200 acres, to be contiguous to the part occupied, and in a square form as near as might be. (3 Revisors' Rep. ch. 4, p. 5.) This was rejected by the legislature, leaving the quantity to be determined by the limits of a known farm, occupied according to the habits of the vicinity. The original report of this section 83, with the remarks of the revisors attached, confirms the

preceding view, and shows that the fourth subdivision was framed expressly to escape the uncertainty of the common law, and the inapplicable rules of the English doctrine, founded upon a dense population and the highest cultivation. The cases of *Jackson* v. *Woodruff*, (1 Cowen, 276, 286,) and *Sharp* v. *Brandow*, (15 Wend. 597,) are both inapplicable. The former was decided before the revision. The latter lim ited the adverse possession to actual improvement, and did not present the question here involved. (*Simpson* v. *Down ing*, 23 Wend. 316, 322.)

IV. All necessary conveyances will be presumed, to uphold a possession such as the defendant represents. (*Johnson* v. *Warford*, 7 Wend. 62 ; *Hoyt* v. *Carter*, 16 Barb. 212, 220.)

V. The defendant, as mortgagor in possession, may defend an action of ejectment by the true owner. *First.* A mort gagee having possession of the land after forfeiture, by the assent of the mortgagor, or by any legal mode, is entitled to retain his possession until his debt is paid. (*Jackson* v. *Bowen*, 7 Cowen, 13; *The same* v. *Myers*, 11 Wend. 533 ; *Van Duyne* v. *Thayre*, 14 id. 233 ; *Phyfe* v. *Riley*, 15 id. 248 ; *Waring* v. *Smyth*, 2 Barb. Ch. 119 ; *St. John* v. *Bump stead*, 17 Barb. 100.) *Second.* The possession of a mort gagee, continued a length of time after forfeiture, to bar an entry, will be presumed to have originated under legal pro ceedings, or with the assent of the mortgagor. *Third.* The mortgage from Hugh Munro to Jacob Walton, Isaac Low and Anthony Van Dam was sufficiently proven. It was reg istered in the customary form, and certified by the original attestation of the clerk, as of the day of the registry. There was then no other mode of record, or of preserving proof of conveyances. *Communis error facit jus.* *Fourth.* The mortgage followed the title of the original mortgagees. Their conveyance of the mortgaged premises *with covenants* ope rated as an assignment of their mortgage interest.

VI. The court erred in directing a verdict, and refusing liberty to the defendant to take the opinion of the jury upon

the questions of fact involved. *First.* The several questions of fact involved in the defense of adverse possession—such as the nature and extent of the defendant's possession, and whether according to the usages of the country—belonged exclusively to the jury. (*Jackson* v. *Joy,* 9 John. 102; *Clapp* v. *Bromagham,* 9 Cowen, 530.) *Second.* The case should have been submitted to the jury upon the presumption of a conveyance and of foreclosure. (*Schauber* v. *Jackson,* 2 Wend. 12, 59, 63; *Briggs* v. *Prosser,* 14 id. 227, 229.)

*Geo. G. Munger,* for the respondent.

I. The objections to the admission of the records of the wills of Isaac Van Dam and Thomas Moore, and of the letters of administration granted thereon, and to the deed from Livingston to Walton, Low and Van Dam, were each properly overruled, because those records were competent, and *prima facie* evidence of the death of Isaac Van Dam and Thomas Moore, respectively. (1 Green. Ev. § 550, and cases cited in the note; 2 id. § 278, d.; *French* v. *Frazier's Adm'rs,* 7 J. J. Marsh, 425; *Russell* v. *Jackson,* 22 Wend. 277; *McNair* v. *Ragland,* 1 Dev. Ch. 553; *French* v. *French,* 1 Dick, 268; *Jaffers* v. *Radcliff,* 10 N. H. 242; *Doe* v. *Penfold,* 8 C. & P. 536; *Newman* v. *Jenkins,* 10 Pick. 515; *Fosgate* v. *Herkimer Manf. Co.* 12 Barb. 352.)

II. The motion for a nonsuit, at the close of the plaintiff's case, was properly denied. The second ground of the motion has been disposed of by the court below. The third ground is a mere repetition of the question involved in the preceding point. The fourth ground was not insisted on in the court below. It is hardly necessary to say that the similarity of names is prima facie sufficient. (*Jackson* v. *King,* 5 Cowen, 237.) The remaining question is that presented by the 6th, 7th and 8th grounds, viz. the alienism of the plaintiff and his predecessors. 1. The 9th article of the treaty of 1794 between the two governments of Great Britain and the United States, (1 U. S.

Laws, 206, by Bioren & Duane,) *alone* disposes of this ques-
tion.    That article is as follows : "It is agreed that British
subjects who now hold lands in the territories of the United
States, and American citizens who now hold lands in the
dominions of his majesty, shall continue to hold them accord-
ing to the nature and tenure of their respective estates and
titles therein, and may grant, sell or devise the same to whom
they please, in like manner as if they were natives ; and that
neither they, nor their heirs or assigns, shall, so far as may
respect the said lands and the legal remedies incident thereto,
be regarded as aliens." The uniform construction given to
this article by both British and American courts, *is,* that it
applies to all persons who were living and had existing titles
at the date of the treaty, and that it saves to such persons
and their heirs and assigns such estates, unaffected by any
question of alienism.    It is also held that possession is not
necessary, but only an existing title.    (*Orser* v. *Hoag,* 3 Hill,
79 ; *Hughes* v. *Edwards,* 9 Wheat. 489 ; *Shanks* v. *Dupont,*
3 Pet. 242 ; *Sutton* v. *Sutton,* 1 Russ. & Mylne, 633.) The
term heirs and assigns, in the article, is not to be restricted
to immediate descendants, but is to be extended indefinitely
until the title reaches a citizen.    Such is the literal construc-
tion of the expression, and such *is* the obvious design and
policy of the whole treaty.    This construction was evidently
in the minds of the court in *Jackson* v. *Lunn,* (3 John. Cas.
109,) and *Jackson* v. *Wright,* (4 John. 79,) although neither
case rendered an adjudication of the precise point necessary.
There are several analogous cases in this state.    (*Jackson* v.
*Adams,* 7 Wend. 367 ; *Goodell* v. *Jackson,* 20 John. 707 ;
*Jackson* v. *Etz,* 5 Cowen, 314 ; *Jackson* v. *Lervey,* Id.
397 ; *Duke of Cumberland* v. *Graves,* 3 Seld. 305.)   Hugh
Munro the elder, [Walton, Low and Van Dam's grantee,]
being alive at the date of the treaty and holding an existing
title, would have conferred a good title upon both Hugh
Munro the younger, and the plaintiff, even had they both
been aliens and taken by descent from him.    2. But it may

be well to look at the precise case of each of these persons.
(*a.*) Hugh Munro the elder, was undoubtedly an alien, hav-
ing left this country prior to the revolution, and never re-
turned. But his title was not disturbed by that war. It is
a well settled principle that revolutions or changes in govern-
ments do not of themselves work a forfeiture of previously
vested rights. (*Orser* v. *Hoag*, 3 Hill, 79 ; *Soc. &c.* v. *New
Haven*, 8 Wheat. 464–81.)  (*b.*) Hugh Munro, the younger,
was not an alien ; he was born in New Jersey, in 1764 or 5,
and remained in this country until a year or two after the
close of the revolutionary war.  He was born upon the soil,
and remained long enough after the close of the war to make
his election, and to owe allegiance to this country. (*Jackson*
v. *White*, 20 John. 313 ; *Orser* v. *Hoag*, 3 Hill, 79 ; *Inglis*
v. *Trustees of Sailors' Snug Harbor*, 3 Peters, 121 ; *Orr* v.
*Hodgson*, 4 Wheat. 453.)  (*c.*) The plaintiff is not an alien.
He was born in this country, and under the present govern-
ment.  That fact alone, irrespective of, or rather despite, all
other considerations, makes him a native born citizen.  (Bac.
Ab. tit. Alien, A ; Com. Dig. Alien, A. & B ; 7 Co. 19,
Calvin's Case ; 1 Blk. Com. 236–74 ; 2 Kent Com. 37–50 ;
*Lynch* v. *Clark*, 1 Sand. Ch. R. 583, *in point.*)  Moreover
he acquires title *by purchase*, and not by descent, which title
is good until office found.  Under first proposition, see *Evert-
son* v. *Sawyer*, (2 Wend. 507 ;) *Catlin* v. *Jackson*, (8 John.
520 ;) *Rich* v. *Baker*, (3 Denio, 79 ;) *Cooper* v. *Galbraith*,
(3 Wash. C. C. 546.)  Under last proposition, see *The Peo-
ple* v. *Conklin*, (2 Hill, 67 ;) *Fairfax, dev.* v. *Hunter's
Lessees*, (7 Cranch, 648.)

III.  The motion for a nonsuit, at the close of the defend-
ant's case, was properly denied.  1. The defendant failed to
establish an adverse possession of the premises.  (*a.*) It can
not be pretended that a case of actual adverse possession was
made out.  The evidence fails to show a *pedis possessio* for a
period exceeding ten years before the commencement of this
action.  (*b.*) The nature of the use or occupancy has not been

such as to make the case one even of constructive adverse possession. The doctrine of constructive adverse possession in this state, although originating with the courts, (*Jackson* v. *Bowen*, 1 Caines, 358 ; *Jackson* v. *Elston*, 12 John. 452 ; *Jackson* v. *Woodruff*, 1 Cowen, 276 ; *Jackson* v. *Richards*, 6 Cowen, 617,) now rests wholly upon statutory provision. (3 R. S. 503, §§ 82, 83, 5th ed.) The section defining the nature of the occupancy is in the following language :

"For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument, or a judgment or decree, land shall be deemed to have been possessed and occupied in the following cases :

1st. Where it has been usually cultivated or improved.

2d. Where it has been protected by a substantial enclosure.

3d. Where, although not inclosed, it has been used for the supply of fuel or fencing timber for the purposes of husbandry, or the ordinary use of the occupant.

4th. Where a known farm or a single lot has been partly improved, the portion of such farm or lot that may have been left, not cleared or not enclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated." (§ 83.)

Has the possession in this case been of either of the kinds specified in this section ?    1st. It is hardly necessary to dwell upon the first two subdivisions.    2d. The obvious construction of the third subdivision is to read the expressions in regard to fuel and fencing timber in connection with the remaining expressions.    In other words, the inquiry is not whether the premises have been used for a supply of fuel or fencing timber simply, but for the supply of fuel or fencing timber *for the purposes of husbandry, or the ordinary use of the occupant*.    The history of the subdivision confirms this view.    The revisers reported as follows : "Where, although

not enclosed, it has been used for the supply of fuel or fencing timber *for the purposes of a farm of which it forms a part.*". Under the subdivision in this form there would manifestly have been but two cases, viz. either of fuel or fencing timber, with the limitation on *both* of a use for the purposes of a farm of which the parcel formed a part. The legislature, however, preferring a wider range, struck out the revisers' *single* limitation, and inserted the present *double* limitation. The construction here submitted is given to the subdivision by Mr. Justice Wright, in the *People* v. *Livingston*, (8 Barb. 255–63.) The first inquiry then, under this subdivision is, whether the premises have been used for the supply of fuel or fencing timber. If that can not be answered affirmatively, there is an end of the case under this subdivision. The response must be a prompt negative, for it does not appear that a single stick of fuel or fencing timber has *ever* been taken from the premises. 3d. Does the case fall within the fourth subdivision? The controlling inquiry under this subdivision is, has the quantity of uncleared or unenclosed land accorded with the usage of partly improved farms, or single lots of the adjoining country? The revisers in their notes on this subdivision, (3 R. S. 700, 2d ed.) say, that "it is adapted to a peculiar state of country, and is in conformity to the principle adopted by the Supreme Court in 6 Cowen, 679. Instead of an arbitrary rule, which the cunning may evade and to which false witnesses may adapt their testimony, it presents the principle which governs in commercial and other cases of appealing to the common usage or custom, of which jurors will be the very best judges." Cowen, J. in *Simpson* v. *Downing*, (23 Wend. 316,) said that, "the ideal possession can not be extended by a written instrument beyond the size of the lot or farm partly occupied. *The size must accord with the usage of the adjoining country.*" The custom here spoken of by the statute, the revisers and the court, is a particular custom, and concerns simply the size of partly improved farms, and the size

thereon of uncleared and unenclosed lots, and is not at all the custom to which the only evidence given by the defendant pointed, viz. *the custom of generally inclosing timber lands.* Such an inquiry contained none of the features of the statutory custom, and was quite irrelevant. On this general subject of constructive adverse possession, the cases of *Jackson* v. *Oltz,* (8 Wend. 441,) *Sharp* v. *Brandow,* (15 id. 597,) and *Lane* v. *Gould,* (10 Barb. 254,) in addition to those already cited, are worthy of perusal. All the cases since the revised statutes, will be found to follow the statutory rule as their sole guide, and to evince no disposition to enlarge or vary it. Indeed the statute has been pronounced merely declaratory. (*Simpson* v. *Downing,* 23 Wend. 320-2.) 2. The defendant can not be regarded as a mortgagee in possession. (*a.*) No mortgage was proven. (*b.*) The registry record, offered in evidence, does not purport to be a copy of the mortgage, but only an abstract of it, and the colonial act does not make the registry evidence of the mortgage. (1 N. Y. Laws, 324, by Van Schaack.) Aside from statutory regulation, it is a familiar rule that public records and official registers are evidence only of such facts as are required to be recorded in them, or which occurred in the presence of the registering officer. (1 Greenlf. Ev. § 493; *Baker* v. *Kingsland,* 10 Paige, 366; *Newman* v. *Doe,* 4 How. (Miss.) 522; *Rex* v. *Clapham,* 4 Car. & P. 29; *Wihen* v. *Low,* 3 Stark. 63; *Jackson* v. *Leggett,* 7 Wend. 377; *McCravey* v. *Remson,* 19 Ala. 430.) The precise point was adjudicated in *Den* v. *Gustis,* (7 Halst. 42,) under a statute of New Jersey, substantially the same as our colonial act. See also *Quay* v. *Eagle Fire Ins. Co.,* (Anth. N. P. 173.) The colonial act in question is a mere statute of notice, and has never been regarded otherwise.

The courts have uniformly spoken of it as such, and the history of our recording and registry statutes shows this to be the case.

Those in regard to deeds have always provided for their

recording, and made the record evidence. Those relative to mortgages, on the other hand, have uniformly, until the year 1822, directed a mere registry, with no force as evidence, and since 1822 no statute can be produced which affects to change the colonial or earlier statutes from their original character of mere registry acts. (*Fort* v. *Burch*, 6 Barb. 60.) Even if the mortgage be proven, no one, since the mortgagee, has been shown to have any interest in it. The only ground for such a claim is an instrument, which for the present purpose, it may be conceded, is a deed of the mortgaged premises from the mortgagee. It is well settled that such an instrument does not carry any interest in the mortgage. The leading case of *Jackson* v. *Bronson*, (19 John. 325,) is to that effect, and the doctrine of that case has been generally followed. (*Wilson* v. *Troup*, 2 Cowen, 195, 230; *Dickenson* v. *Jackson*, 6 id. 147–49; *Ellison* v. *Daniels*, 11 N. H. Rep. 274; *Furbush* v. *Goodwin*, 5 Fost. (N. H.) 425; *Doe* v. *Spinning*, 1 Halst. 466.) The case from 11 N. H. discusses the question very fully. Those cases in which purchasers at sales upon irregular mortgage foreclosures have been protected against suits by the mortgagors do not militate against this doctrine. Such proceedings are instituted upon the mortgage by the holder of it, and the object is to convey the interests of both mortgagor and mortgagee. In case, for any technical reason, they fail to convey the legal estate of the mortgagor, but have been sufficient so far as the mortgagee is concerned, there is no reason why they should not be held to pass the interest of the mortgagee, viz. to change property in the mortgage itself. None of these cases have intimated any inconsistency between them and the cases cited, much less evinced the least intention of overruling them. (*Jackson* v. *Minkler*, 10 John. 480; *Jackson* v. *Bowen*, 7 Cowen, 13; *Phyfe* v. *Riley*, 15 Wend. 253; *Fort* v. *Burch*, 6 Barb. 60.) Some cases have held that a *void* foreclosure would have this effect, but the contrary is decided in *Olmsted* v. *Elder*, (1 Seld. 144.) The proceeding must not be more

than irregular.   3. The defendant's possession as mortgagee would be no defense.   This would have been the case prior to the revised statutes, but since the right of the mortgagee to maintain ejectment has been taken away, his possession can not operate as a defense to the action.   This effect of the possession followed from the right of the mortgagee to maintain the action, and rested solely on that right.   That being abolished, all of the former incidents of the doctrine must fall with it.   The suggestion of Justice Paige in *Fort v. Burch, (infra,)* is the sound doctrine under the revised statutes, and must, it is submitted, be accepted in preference to the case of *Phyfe v. Riley, (infra.)*

IV. The several requests of the defendant to go to the jury were properly denied.   1. Upon the question of adverse possession there was nothing for the jury.   There was no controversy as to facts.   "The nature and character of the defendant's possession" were conceded and transparent. The only question was whether *it was of the character prescribed by the statute,* and that was a question for the court.   Upon an admitted or uncontroverted state of facts, the question of adverse possession, like all questions of fact so denominated, is a question of law.   (*Bowie* v. *Brahe,* 3 Duer, 35, 44; *Clapp* v. *Bromagham,* 9 Cowen, 530; *Woodward* v. *McReynolds,* 1 Chand. (Wis.) 244; *Macklot* v. *Dubrail,* 9 Mo. Rep. 477–87.)   2. The custom stated in the second request is not recognized by the statute.   3. There was no evidence as to the custom stated in the third request. The only evidence which can be pretended upon this point, was that in regard to the Foot estate and the Nicholas Palmer farm, which, as already submitted, falls far short of the statutory custom.   It was moreover *the practice of two particular farms or estates, and did not purport to be a general custom.*   These two individual instances did not tend in the slightest degree to establish a custom, and consequently there was no evidence for a jury.   (2 Pars. on Cont. 56; *Holford* v. *Adams,* 2 Duer, 471–81.)   4. There was no case for the

jury upon the presumption of conveyances or extinguish-
ment of title, to uphold the possession of the defendant and
his predecessors. The doctrine of presumptions in such
cases is a familiar one to the courts, and has its well defined
limits. (*a.*) The largest class of cases is that in which the party
seeking the benefit of the presumption, is shown to be the
owner *in substance* of the land, but lacks some mere matter
of form. Such cases are those of the vendor and vendee in
performed land contracts, of trustees and cestuis que trust
under trusts to convey, of mortgagor and mortgagee after pay-
ment of the mortgage debt, and in short of all persons who
are the *equitable* owners of the land, and stand in need only
of the form of a legal title. (1 Cowen & Hill's Notes,
pp. 355–371; *Keen* v. *Deardon,* 8 East, 263; *Van Dyck* v.
*Van Beuren,* 1 Caines, 83; *Jackson* v. *Murray,* 7 John. 5;
*Jackson* v. *Matsdorf,* 11 id. 91; *Jackson* v. *Cole,* 4 Cowen,
587; *Jackson* v. *Lamb,* 7 id. 431; *Jackson* v. *Russell,*
4 Wend. 543; *Briggs* v. *Prosser,* 14 id. 227; *Roseboom* v.
*Mosher,* 2 Denio, 61; *Doe* v *Cook,* 6 Bing. 174; *Blake* v.
*Davis,* 20 Ohio Rep. 331.) (*b.*) The other class of cases is
one in which the party makes out a complete chain of title,
with the exception of one or more links which he seeks to
supply, upon this doctrine of presumption, by proof of some
circumstances of knowledge, approbation or consent at some
time of the real title holder, or admissions or acts of acqui-
escence in the contesting party, sufficient to make it proba-
able that his chain of title is in point of fact good, although
all of its links are not now visible. (*Mayor of Kingston-*
*upon-Hull* v. *Horner,* 1 Cowp. 102; *Eldridge* v. *Knott,* Id.
214; *Goodtitle* v. *Duke of Chandos,* 2 Burr, 1065; *Jackson*
v. *Lunn,* 3 John. Cas. 109; *Jackson* v. *McCall,* 10 John.
377; *Schauber* v. *Johnson,* 2 Wend. 13; *Jackson* v. *Man-*
*cius,* Id. 357; *Doe* v. *Butler,* 3 id. 149; *Jackson* v. *Russell,*
4 id. 543; *Jackson* v. *Vincent,* Id. 633; *Jackson* v. *War-*
*ford,* 7 id. 62; *Jackson* v. *Davis,* 5 Cowen, 130; *Jackson*
v. *Moore,* 6 id. 706; *Clark* v. *Faunce,* 4 Pick. 246; *Lessee*

*of De Lancey* v. *McKeen,* 1 Wash. C. C. 354; *Sumner* v.
*Childs,* 2 Conn. Rep. 607; *Ransdale* v. *Grove,* 4 McLean,
282.) In both of the classes stated, these presumptions
are pesumptions of fact, or a species of evidence, and as such
must have some pertinent facts and circumstances to rest
upon for their support. *Mere length of time is nothing.*
To allow a jury to take that fact alone as the basis of a pre-
sumption, is to permit a thing to be inferred *from something
not seen.* (See the language particularly of Lord MANSFIELD
and Mr. Justice WILMOT in *Goodtitle* v. *Duke of Chandos,*
of Chancellor WALWORTH in *Schauber* v. *Johnson,* and of
SUTHERLAND, J. in *Jackson* v. *Davis.*) It is also important
to consider whether the presumption is sought to *support* a
right, as in the cases of *Eldridge* v. *Knott* and *Jackson* v.
*Moore,* or to *defeat* a right, as in the cases of *Jackson* v.
*Lunn* and *Jackson* v. *Russell.* (c.) It has been loosely said
in some *obiter dicta* of judges, and by some text writers,
that after a great lapse of time a grant of lands will be pre-
sumed. This is correct, perhaps, if limited to cases *not
within the statute of limitations;* otherwise, it is entirely
opposed both to principle and authority. (*Clark* v. *Faunce,*
4 Pick. 246; *Sumner* v. *Child,* 2 Conn. Rep. 607.) The
subject is very fully discussed in the case last cited. (d.) Any
less stringent rules or limitations would make this doctrine
of presumptions, as is well remarked in the case from 2 Conn.
Rep. in the hands of courts and juries, *a complete evasion
of the statute of limitations.* (e.) The present case has no
claims for the application of this doctrine. The only evi-
dence upon the question is an instrument, in form a deed, in
no way connected with the real title, and a possession for
about sixty years of a very small portion of the premises.
There are, in such evidence, no indications of a beneficial
ownership within the rule first stated, and not a single fact
or circumstance tending to supply the missing link of the
defendant's pretended title within the last rule. There is no
deed from the true source of title—no contract for one—no

receipt, or other proof of payment of the consideration money—no proof of any deed having ever existed, or having been seen—no proof of any knowledge or consent on the part of the true title holder—no ground, in short, of whatever kind, on which, in the language of Lord MANSFIELD, "to build any presumption." It is simply a case of clear legal title on the one hand, and a bare claim of adverse possion on the other hand.

DENIO, Ch. J. It is not denied that Hugh Munro the elder, to whom the premises in question were conveyed in 1774, lived and died a subject of the King of Great Britain. He was born in Scotland, and, at an early day, came to reside in the colony of New York, and lived near Fort Miller, within the present county of Saratoga, when he received the conveyance of these lands. Shortly afterwards, and about a year before the commencement of the revolutionary war, he went to Montreal, and always afterwards resided in Canada, until his death, in 1802. He was consequently an alien, as regards this state, from the time of the establishment of an independent government here until his death.

I have no doubt that the second Hugh Munro, the son of the former, was also an alien, though that position is questioned by the plaintiff's counsel. According to the account which he gives of himself, in his deposition, he was born in Amboy, New Jersey, in about 1766; went with his father's family to the neighborhood of Fort Miller, and was left there with his mother and the remainder of the family when his father went to Canada. At the commencement of the war his mother went with her family, consisting of this son and four other young children, to the city of New York, where, and on Long Island, then also in the possession of the British army, they or the survivors of them remained until the close of the war. The mother and all the children, except this son, appear to have died during the war. He was with an aunt on Long Island at the peace, and was then sent for by

his father to come to him in Canada, whither he accordingly went; and he has ever since resided in Canada, in the same town in which his father lived, whose property there he inherited. He states the time when he went to Canada as a year or two after the close of the revolutionary war, but he says, likewise, that he was then sixteen or seventeen years old. There is a lack of precision about this date, for, upon his own statement of his age, he must have been fully seventeen at the treaty of peace, in 1783. But I do not think it material to the question of his alienage, whether he remained in this state a short time after the treaty or not. He was a minor, subject to and under the control of his father, whose power over him he acknowledged, and whose directions as to the disposition of his person he obeyed. So far as an election between the old and the new government enters into the question of his alienage, it was determined in favor of the former by the party authorized to act upon that question. This Hugh Munro, equally with his father, was born a British subject. He did not become a citizen of New York by force of the declaration of independence, or the act of the convention of July 16, 1776, which affirmed that all persons abiding within the state, and deriving protection from the laws of the same, owed allegiance to the said laws, and were members of the state; because, independently of his minority, he withdrew or was withdrawn from the place where these laws practically operated, and was placed under the protection of the British government, in a locality possessed by its armies and wholly under its control. Nor did he become a citizen of this state by force of any election to abide therein after the British forces were withdrawn after the conclusion of the peace, for he was incapable from his non-age of making an actual election, and did not attempt to do so; and if he did remain here for a short time after the treaty, which is not certain, no election can be inferred from that circumstance, on account of the same disability; especially as we have seen that he conformed to the directions of his father,

an acknowledged British subject, by repairing to a British colony as soon as those directions were signified to him. In *McIlvaine* v. *Coxe's Lessee*, (4 Cranch, 209,) in which the citizenship of one David Cox was in question, it was held that he became a citizen of New Jersey by voluntarily remaining in that state, and under the protection of its laws, after the declaration of independence and after the legislature had passed an act declaring such persons to be members of and in allegiance to the new government. There was no question of disability, on account of infancy, in the case. The effect of going to reside within the lines of the British army, and the power of a father to elect for his minor children upon the question of citizenship, on the severance of this state from the British dominions, as I have stated these principles, was affirmed by the Supreme Court of the United States in *Inglis* v. *The Trustees of The Sailors' Snug Harbor*, (3 Peters, 99.)

But assuming it to be shown that both father and son were aliens when the former died, in 1802, the question arises whether the latter could or could not, under the circumstances of the case, inherit from the former. Hugh Munro senior became seised of this estate while a British subject, before the revolution, and was never attainted of treason, but continued so seised until after the treaty of peace of 1783, and the subsequent treaty of commerce of 1794. By the treaty of 1783 future confiscations were forbidden, and no person was to suffer loss on account of the part he had taken in the contest, (§ vi;) and by the treaty of commerce more ample protection was afforded to individuals of the respective nations having titles to land, by article ix, which is in the following words: "It is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his majesty, shall continue to hold them according to the nature and tenor of their respective estates and titles therein; and may sell, grant or devise the same to

whom they please, in like manner as if they were natives; and that neither they *nor their heirs or assigns* shall, so far as may respect the said lands and the legal remedies incident thereto, be regarded as aliens." The right of the elder Munro to enjoy these lands during his lifetime, to alien them or to transmit them by descent to a citizen of the United States, is not questioned. Such rights are within the plain language of the last mentioned treaty, and they have been affirmed in a great number of adjudicated cases. Indeed it is probable that apart from the treaty stipulations, the fact of the independence of the former colonies would not have divested the titles to land which individuals in either of the separated nations held within the territories of the other, according to the dictum in *Calvin's case*, (7 Coke, 27, b.) But the question before us is whether the second Hugh Munro, being also an alien as has been shown, could inherit the lands held by his father, under the protection of the treaties. The defendant could maintain that the spirit of the treaty stipulations would be satisfied by conferring upon persons in the situation of Hugh Munro senior only the capacities of a citizen of the United States. Possessing that character, and with no other privilege, he could convey the land to any person, whether he were a citizen or an alien, with the qualification that, in the latter case, it might be taken from the grantee by a proceeding in behalf of the state; and he could transmit by descent to his heirs being citizens, but not to alien heirs. But the exigency of the case required something more than this. Persons holding titles to land in what had become, as to them, a foreign jurisdiction, were no doubt very numerous, and their descendants and kindred, and those also with whom it would be convenient for them to have dealings respecting their lands, would be likely to be of their own nation, and consequently aliens to the jurisdiction in which the lands were situated. The devolutions of title upon intestacy would be constantly occurring, so that the protection of the title of the present possessor simply would not, in many

cases, prevent the loss of the estate, which it was the purpose of the treaties to guard against. These considerations, I presume, led to the insertion of the concluding words of the article in the treaty of 1794 referred to, namely, that the *heirs and assigns* of the persons holding lands in the foreign nation should not be regarded as aliens as it respected such lands.. It is impossible to give this language any effect without holding, at least, that persons in the position of the immediate heirs then in life, of the individual holding the existing title, were relieved from the disability of alienage, so far as it regarded such lands. Such a construction would be sufficient for the purposes of the plaintiff in this case. The authorities certainly go to that extent, if they do not carry the rule considerably further. The broadest construction would be, that the lands embraced within the purview of the ninth article of the treaty of commerce were indefinitely and perpetually heritable and alienable, to and among aliens of the two countries, in derogation of the laws respecting alienage which were or should be established therein, until they should come to be held by citizens, after which no one would deny that they would lose the peculiar attribute impressed upon them by the treaty.

In *Harden* v. *Fisher*, (1 Wheat. 300,) the plaintiffs, British aliens, claimed to recover in ejectment as heirs of one Fisher, a British subject who died in 1798. He was shown to have been seised of the premises in 1777, but the special verdict upon which the case was heard did not find that his seisin continued down to the time of the treaty, and on that formal ground the judgment for the plaintiffs was reversed. The opinion of the court by Chief Justice MARSHALL, and the order for judgment, both assume that the treaty would have enabled the alien heirs to inherit if their ancestor was seised when it was signed.

In the case of *Orr* v. *Hodgson*, (4 Wheat. 453,) it appeared that the title to the lands in controversy was vested in one Lucy Paradise, a British subject, at the date of both

treaties. She died in 1814, leaving two grandchildren her only descendants, born and always residing in Venice, and consequently Austrian subjects, and two nieces, natural born citizens of the United States; and the general question was whether the land descended to these nieces, or to the grandchildren. The court, after establishing that the title of Mrs. Paradise was protected by the treaties, and laying down the rule that the grandchildren, if incapable of taking by descent, on account of their alienage, would not impede the descent to the nieces, proceeded to consider the effect of the treaties upon the succession. After quoting the 9th section of the treaty of 1794, the opinion was expressed that persons who were aliens to both countries—the United States and Great Britain—could not take by inheritance under that section. No doubt seems to have been entertained that an heir who was an alien to the country in which the lands were situated could have inherited from an alien ancestor, if he was a citizen of one of the nations which were parties to the treaty. "It can not be presumed," Mr. Justice STORY said, "that the treaty stipulated for benefits to any persons who were aliens to both governments."

In *Shanks* v. *Dupont*, (3 Peters, 242,) the question was as to the right to a sum of money paid into court in a suit in partition, the proceeds of a sale of lands in South Carolina. The original defendants were British aliens, and claimed to have inherited a moiety of the lands which had been sold under the partition proceedings from their mother, a certain Ann Shanks. Mrs. Shanks was born in South Carolina before the revolution, married a British officer during the war, and went with him to England in 1782, where she died subsequently to the treaty of 1794. The only question discussed in the case was whether, under the circumstances appearing, she was an American citizen or a British subject at the time of the signing of the treaty, it being taken for granted that if she was an alien to this country the inheritance of her alien children was guarantied by the treaty, but that if she

were an American citizen she could not transmit by descent to her alien children. It was decided that she was to be regarded as a British subject at the date of the treaty, and at her death, and consequently that the defendants had inherited the land notwithstanding their alienage, and were entitled to the fund in dispute. The case affirmed, very distinctly, the position that a British alien holding land within the purview of the treaty of 1794 possessed a capacity to transmit by descent to alien heirs, which an American citizen could not lay claim to. The point seemed too clear for discussion, and hence the only question considered by the judges was, as I have mentioned, whether the ancestor were a citizen or an alien.

The principle under consideration was applied to the descent of land situated in England, the title to which was held by an American citizen at the time of the treaty, in *Sutton* v. *Sutton*, (1 Russ. & M. 663.) In a bill for the specific performance of a contract for the sale of lands situated in the city of London, it appeared that one Samuel Strudwick, a citizen of the United States, conveyed them to a person under whom the vendor derived title, in the year 1819. This Strudwick claimed to have inherited the premises from his father, W. F. Strudwick, another American citizen, who died intestate in 1810, and the latter derived title by devise from his father, Samuel Strudwick the elder, who was born in North Carolina before the revolution, adhered to the United States and was consequently an American citizen, and died seised of the premises in 1794. The English courts consider the treaty to have taken effect at the date of the exchange of the ratifications, October 28, 1795, that being the date mentioned in the act of parliament ratifying the 9th article of the treaty. It will be seen that at that time W. F. Strudwick was seised of the premises. He being an alien was, by the common law of England, incapacitated on account of his alienage to transmit a title by descent, and his son was unable to inherit lands in England

for the same reason; and moreover, that son was unable to convey a title by deed which would not be subject to forfeiture to the crown, upon office found. Hence the title was fatally defective, unless it was made good by the treaty. The principal question discussed was whether the treaty was not abrogated by the war of 1812; but the counsel for the vendee urged the same argument which is insisted on as to lands in the United States, by the counsel for the defendant here, viz. that the consequences of the construction contended for would be that all the lands which at the date mentioned belonged to Americans "are taken forever out of the operation of the general law of England, and may in all time to come be transmitted by aliens by descent, devise or conveyance." The counsel for the vendor accepted this as the result of his construction. "The effect of it is," he said, "to exclude, and to exclude forever, the principle of alienage as to certain persons and certain lands." The master of the rolls held the title good. He said the privilege was given not only to the alien possessors of the lands, but to their heirs and assigns; that the treaty in this respect was permanent, and not affected by the war of 1812. It thus appears that the superior courts of both nations have concurred in the doctrine upon which the plaintiff relies.

The principle that alien heirs may take by inheritance from alien ancestors who held lands under the protection of the treaty, has been repeatedly recognized in the courts of this state. In *Jackson* v. *Wright*, (4 John. 75,) the plaintiff showed title in one of his lessors by an award of the Onondaga commissioners, in 1800, which was not dissented from; but it was shown that the legal title was formerly in one Nelson, a British subject, who died seised in 1798, in New York, without issue; but he left a brother and three sisters his only heirs, who were aliens. One of the sisters was a married woman, and was within the saving of the act creating the board of Onondaga commissioners, and was not therefore prejudiced by a failure to dissent. The others, not

being under any disability, were held to have lost their title by not dissenting from the award. It was held that they were all capable of taking, notwithstanding their alienage, by force of the treaty of 1794, Nelson being seised when the treaty was made, but that all except the feme covert had lost their title by not dissenting. VAN NESS, J., in giving the opinion of the court, said that it was the intention of the contracting parties to the treaty that the citizens and subjects of each should be quieted in the enjoyment of their estates, "in the same manner as if they *and their heirs* had been native citizens." The plaintiff's recovery was therefore so limited as to exclude the share of the sister whose title was saved on account of her coverture. In *Orser* v. *Hoag,* (3 Hill, 79,) the principle referred to was assumed to be well established, but the title of the alien heir did not prevail because the ancestor died before the treaty was signed, and they were not therefore within its influence.

There is a class of cases, very analogous in principle, which would go far to establish the plaintiff's construction of the treaty, if there were no direct authorities. Acts of the legislature authorize aliens to take and hold real estate, and public grants of land to aliens, have been repeatedly held to be descendible to alien heirs, contrary to the general rules of law. (*Goodell* v. *Jackson,* 20 John. 707; *Jackson* v. *Etz,* 5 Cowen, 314; *Jackson* v. *Lervey,* Id. 397; *Duke of Cumberland* v. *Graves,* 3 Seld. 305.)

It is contended that the plaintiff is himself, an alien. He was born in this state of non-resident alien parents, his mother being here simply, it would appear, for the purpose of being confined. He now resides in this state, and is *prima facie* a citizen; but whether he is a citizen or not is not material, for he does not derive his title by inheritance, or by an act of law, but by purchase, he having acquired the right of the party to whom the premises were sold on execution, in the manner authorized by the statute; and it is very famil

iar law that an alien may take by purchase and hold against all parties except the state, claiming under an inquest of office.

I have examined with attention the voluminous depositions read upon the trial, upon the question of adverse possession. The material facts are substantially as follows : Subdivision lot No. 14 on the map of the Gansevoort estate, the north half of which was conveyed to the defendant in 1848, contains about eighty-seven acres of land, and embraces parts of the original or great lots 1, 2 and 3 of the 20th allotment of the Kayaderosseras patent. No. 2 lies directly north of No. 3, and the subdivision lot No. 14 is on both sides of the division line, about 47 acres of it being on lot No. 2. The complaint is for the north half of No. 14, but only about sixteen acres of that north half is on great lot No. 2.

It is not pretended that any part of this lot No. 14 was cleared or cultivated prior to about 1848, when the defendant received his conveyance, about seven years before the commencement of this suit. If there was a prior possession, adverse to the plaintiff's title, it was a constructive one, arising out of the facts to be next mentioned.

General Peter Gansevoort, jun. (the hero of Fort Stanwix) acquired his title to great lot No. 2 in 1797, when he received a deed in fee from Anthony Van Dam, by Gerard Walton his attorney, for the whole lot of about 800 acres, except a small part which had been previously sold. That deed was given after the one under which the plaintiff makes title, and moreover, the power of attorney to Walton was not proved. I shall assume, however, as I am satisfied the law is, that it afforded sufficient color of title on which to found an adverse possession if there was a good constructive occupation. Gen. Gansevoort also claimed to own great lot 3, which is situated, as I have mentioned, north of and adjoining lot No. 2, and some adjacent lands, the whole embracing 1500 or 1600 acres, which was together called General Gansevoort's tract, or Gansevoort's farm. The evidence is very satisfactory to show that the general and his devisees

have claimed title to this tract from about 1788 down to the time it was sold by the executors of his widow, about 1841; and during that period they appear to have regularly paid the taxes upon it. Prior to 1790 he built a log house upon the tract, cleared a portion of it, and subsequently erected mills, a framed house and other buildings. This settlement has been continued, and the quantity of the cleared land gradually extended. As early as 1800, 200 acres were cleared, and about 300 acres had been cleared by 1812, and about 60 acres more by the year 1830. About two thirds of this clearing was on No. 3, and one third on No. 2. This cleared parcel was occupied by and under the general and his successors in the title, and by his and their lessees and tenants, under a claim of title to the whole tract, down to the sale to Sutfin and others, and from thence to this time. During all that period the claim of title to the whole tract has been constant and uninterrupted, and the uncleared land has, for a considerable part of the time, been used extensively for cutting timber trees to be drawn to and manufactured into lumber at his mills and elsewhere, and to be taken thence to market, and the fencing timber for the cleared parcel and for fuel consumed on that parcel; and some fire wood was also sent to Albany. The timber and wood was taken indiscriminately from the parts of the tract where it could be most conveniently got at. There was a survey and map made about 1803, the surveyor running around the whole tract, and placing monuments where necessary. The heirs or devisees of General Gansevoort caused the outlines of the tract to be again surveyed in 1833, and it was subsequently divided into 17 lots, of which the above mentioned No. 14 is one, and a map was made and filed in the clerk's office of Saratoga county. The precise point is, whether so large a tract of forest land can be said to have been possessed and occupied, in consequence of the limited amount of cultivated land, under the circumstances, here shown. These constructive possessions have always presented difficult questions,

and the legislature, in the revision of 1830, undertook to lay down principles which should govern them. (2 R. S. 294, §§ 9, 10. Code, §§ 82, 83.) It is declared, in the first place, that where title is claimed exclusively under a written conveyance and there has been a continued occupation of the premises included in the conveyance, under such claim, for twenty years, "the premises so included shall be deemed to have been held adversely; except that where the premises so included consist of a tract divided into lots, the possession of one lot shall not be deemed the possession of any other lot in the same tract." (§ 9.) The next section states the rule in somewhat different terms. An uninclosed parcel of land is to be considered possessed and occupied, where it has been used for the supply of fuel or fencing timber, for the purpose of husbandry or the ordinary use of the occupant. (Subd. 3) This is foreign to the present purpose, as it relates to parcels of which there is no actual occupancy except the taking of fuel and fencing timber. So large a tract of forest would not be within the intendment of this provision. Then it is enacted that "where a known farm or single lot has been partly improved, the portion of such farm or lot that may have been left not cleared or inclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved and cultivated." (Subd. 4.) I do not understand that there was any division of the original lots into smaller ones until after 1833. When, therefore, Gansevoort, under his deed from Anthony Van Dam, entered upon great lot No. 2 which was included in that deed, and made the extensive, valuable and permanent improvements which I have mentioned, claiming title under that conveyance to the whole of that lot, there being no subordinate allotment which would limit the effect of that entry and possession, it seems to me that by force of the ninth section the whole of the premises included in that deed, namely, the whole of great lot No. 2, are to be deemed to have been held adversely to the plaintiff's

title. This conclusion is not affected by the fourth subdivision of the next section just referred to. Dismissing the idea that this considerable tract of forest land was a known farm, which perhaps can not be affirmed, though it seems to have been sometimes so called, the improvements were in part upon this great lot No. 2, which, prior to 1833, had not been subdivided. That part of the improvements was therefore upon a single lot, namely, the lot No. 2, and by the language of the subdivision the whole lot is to be deemed to have been occupied for the same length of time as the part improved and cultivated. There is a reference in the statute to the course and custom of the adjoining country, and that was evidence of a practice prevailing in that region to some extent, not to inclose considerable tracts of wood land connected with improved lands. We should know, without that evidence, that in the early settlement of lands hitherto in forest, the exterior lines of a person's premises were frequently left unfenced.

The result of these observations is, that as early as 1833, the plaintiff's title was barred by an adverse possession for a much longer period than the statute requires. That possession has never been abandoned. After the division of the great lot into smaller ones, and the compiling of the map, the premises in question were sold by the executors of Mrs. Gansevoort to Sutfin and others, and subsequently by them to the defendant, and their grantees have always exercised notorious acts of ownership, and the defendant has erected a dwelling and resides upon the premises. If the revised statutes were considered as introducing a new rule applicable only to future cases, it might be necessary to inquire how the law stood before. But I am of opinion that the provisions were declaratory of the existing law. The revisors sought to introduce a new qualification by limiting the effect of an improvement upon a large lot to two hundred acres of the contiguous land, but the suggestion was not adopted.

I am therefore in favor of reversing the judgment of the

Supreme Court and awarding a new trial, on the ground that the evidence tended to show an adverse possession under the Gansevoort title, and that it should have been submitted to the jury, under proper instructions.

EMOTT, J. dissented, in respect to the right of Hugh Munro the younger to inherit from his father.

ROSEKRANS and SELDEN, JJ. having been counsel, expressed no opinion.

All the other judges concurring,

Judgment reversed.