[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 265 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 266 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 267 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 268 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 269 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 271 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 272 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 273 
By the common law the plaintiff could not have inherited the estate in controversy from Denis McCarthy of New York, because he traces the descent of the land through aliens, who, having no inheritable blood, were incapable not only of taking by inheritance, but through whom it could not be transmitted. (Jackson v. Green, 7 Wend. 333; The People v. Irvin, 21Wend. 128; 10 Wend. 9, Jackson v. Fitzsimmons; 3Comstock, 408, McGregor v. Comstock.)
The plaintiff insists that the 22d section of the statute of descents removes this difficulty. It is in these words: —
"§ 22. No person capable of inheriting under the provisions "of this chapter shall be precluded from such inheritance, "by reason of the alienism of any ancestor of such "person." (1 R.S. 754.)
The defendants however insist that no others than lineal progenitors of the plaintiff are embraced within the meaning of the word ancestor, as used in this section, and therefore that it does not remove the impediment arising from the alienism of the father and grandfather of Denis McCarthy of New York, who died seised of the estate, and from whom the plaintiff claims to inherit. But I have no difficulty in coming to the conclusion that the word ancestors in the statute was used in a more comprehensive sense, and that the act was intended to remove the impediment of alienism in the transmission of an inheritance, in regard to all the deceased individuals, through whom the blood of the last owner of the land is to be traced to the heir. The revisers in their note to this section say, "the provision was intended to change a "very harsh rule of the existing law, by which a person not "an alien himself, may sometimes be debarred from inheriting." *Page 275 
If we were to adopt the defendants' construction of the act, the mischief of the former law would be very imperfectly remedied. The exclusion of aliens from holding lands is founded on manifest reasons of public policy and safety. But the exclusion of a natural-born or naturalized citizen from taking lands by inheritance, merely because the degree of his consanguinity to the last owner is to be ascertained by tracing his pedigree through deceased aliens, is and always was an absurdity, founded only on a feudal fiction, and not on any sound principle of public policy. Its primary object probably was to enrich the crown by escheats. To exclude a claimant on the ground that his collateral kindred were aliens, is no less absurd than to debar him because his lineal ancestors were in that condition. In England the common law rule was abolished in favor of natural born citizens one hundred and fifty years ago by the statute of 11th and 12th Wm. III. ch. 6, and it applied expressly to all ancestors, lineal and collateral. (1 Evan's Stat. 228, 21Wend. 130.)
Our statute, although in fewer words, is more comprehensive than the English act. It enables naturalized as well as natural-born citizens to inherit through alien ancestors; and if there be any such things known in the law as collateral ancestors, they are embraced within its operation, because the claimant is not to be precluded by the alienism "of any ancestor," "and this means ancestors of any kind or description. The word is used in an unqualified and unlimited sense, and therefore in its most comprehensive sense. (14 Peters R. 198.)
In most of our English dictionaries the word ancestor is defined to be "one from whom a person descends," and some of the law dictionaries agree substantially in this definition. But this is its popular and not its legal meaning. In Termes De La Ley
it is said, that this word, in a forensic sense, is "more properly applied to the prepossessor of an estate than "to the ancestor of a family," and in this sense it is frequently and indeed most generally used in books which treat of *Page 276 
descents of real estate, and in statutes relating to that subject. Mr. Burrill, in his law dictionary, recently published, derives the word in question from antecedere, to go before, and defines it, when used in the law of descents, to be "one who "has gone before or preceded in the seisin or possession of "real estate: a deceased person from whom an estate has passed "to another by operation of law in consequence of his decease. "The person last seised of an estate of inheritance, and "from whom such estate is transmitted to the heir." Blackstone, in his chapter on descents, (2 Com. 201,) uses the words heir and ancestor as correlative terms. "Descent or hereditary "succession is the title whereby a man on the death of "his ancestor acquires his estate by right of representation as "his heir at law; an heir therefore is he upon whom the law "casts the estate immediately upon the death of the ancestor."
Mr. Stephen in his commentaries says, an estate of inheritance is where the tenant is not only entitled to enjoy the land for his own life, but where, after his death, it is cast by the law upon the persons who represent him in perpetuam in right of blood, according to the established order of descent. These persons are called his heirs, and himself their ancestor. (Vol. 1, p. 218.) So where a nephew died seised of lands of which the uncle was rightful heir, but into which a stranger immediately entered, and thus ousted the uncle by abatement, his remedy was by a writ called a writ of mort d'ancestor. (3 Bl.Com. 185; Fitzh. N.B. 195.) This writ directed an enquiry whether the nephew died seised and whether the uncle was his lawful heir; and Lord Coke, in his readings on the statute of Westm. second, says, that the word ancestor in a writ of mortd'ancestor, is in such case intended of the nephew from whom the land descended. (Co. Inst. part 2, p. 400, note 3.) Instances where the word ancestor is used in this sense may be multiplied without end. It will be sufficient, however, to refer to the following: (2 Bl. Com. 243; 2 Kent Com. 419-20; 1Rev. L. 317, section 2, 4; 3 Halst. 345, *Page 277 Den v. Jones et al., where the point was adjudged in NewJersey; Co. Litt. 13 b. Com. on sec. 5.)
Blackstone speaks of lineal ancestors in vol. 2, p. 226 — and of collateral ancestors in vol. 3, p. 186, and the statute 11 and 12 Wm. III., ch. 6, enables natural born subjects to make their titles by descent from any of their ancestors lineal or collateral; although their father or mother or other ancestor by, from, through or under whom they derive their "pedigrees" were aliens; thus using the word to denote not only the collateral kinsman who died seised of the estate, but the intermediate relations through whom the pedigree was traced. So in the case of Edward Courtenay, whose father, the Marquis of Exeter, in 1509, in the reign of Henry the 8th, was attainted of treason; certain manors were afterwards granted to him by queen Mary, in the first year of her reign, and afterwards in the same year an act of parliament was passed by which Edward, the son, and his heirs were restored in blood "as well as son and heir of the marquis, his father, as "to all and every other collateral and lineal ancestor and ancestors "of the said Edward." Here again the word is applied to collateral kinsmen from whom by the canons of descent he might derive an estate. Edward Courtenay died seised of the manors so granted to him by the queen, and his collateral relations claimed them as his heirs, notwithstanding the attainder of his father, through whom they had to trace their pedigree. It was objected that the act of restitution, although it might have enabled him to inherit in his lifetime both from lineal and collateral ancestors, yet it applied only to his lineal heirs, his collateral heirs not being mentioned. But it was held una voce that the act did extend to the collateral heirs; and that it had been sufficient if the act had restored and enabled him in blood only as heir to his father; thereby he and his heirs, as well collateral as lineal, might make their descent from the marquis and from all other the ancestors of the said Edward lineal and collateral; and that the other clause was added ex abundanti for the more clear *Page 278 
manifestation thereof. (3 Coke's Inst. 241.) It is evident, therefore, that if the word ancestors in this statute had been used alone, without the addition of "lineal or collateral," the effect would have been the same. The case of Jackson v.Fitzsimmons, (10 Wend. 9,) was a case in which the descent took place before our present statute took effect, the decision was made afterwards. Patrick Fitzsimmons claimed the land as heir of his uncle, Felix Fitzsimmons, who died seised. Patrick, therefore, for the purpose of showing himself heir, had to trace his pedigree through his father Hugh, the brother of Felix. But his father was an alien and his alienism was held to be fatal to the plaintiff's title. His uncle was not a lineal but a collateral ancestor and according to the defendants' construction of our statute of descents, the 22d section would not have helped the plaintiff in that case if it had been in force when the ancestor died; but it is evident that a different opinion was entertained by the chancellor, (p. 12,) by senator Seward, (p. 16,) and by senator Tracy, (p. 22,) and by chief justice Savage, in Jackson v. Green, a case concerning the same title, (7 Wend. 339.) In both those cases the 22d section of our statute of descents was regarded as an adoption substantially of the English statute of Wm. III. It may be regarded a safe conclusion therefore that the word ancestors by its established import when used in relation to succession to real estate by descent, embraces both lineals and collaterals. The statute, therefore, removes the impediment arising from the alienism of Denis McCarthy, of Kil-macowen, and of Timothy McCarthy, the father and grandfather of Denis McCarthy, of New York, who died seised of the estate in question. They were the plaintiff's collateral ancestors through whom by force of the statute he was enabled to trace his pedigree and make his title.
But it is said that the plaintiff himself is an alien, not regularly or effectually naturalized, and therefore incapable of inheriting. If this be so he must fail, and this point therefore remains to be examined. The objection is that the plaintiff *Page 279 
did not take the oath of his intention to become a citizen two years before his admission, and that this is an indispensable condition precedent without which there was no power or authority to admit him to citizenship.
The plaintiff's answer to this objection is, that he produced and read in evidence the record of his naturalization, on the 26th of August, 1834, in the court of common pleas of Saratoga county, containing the following recital, namely, "It "having appeared to this court that Denis McCarthy has in "due form of law more than two years since declared his intention "to become a citizen of the United States," c., and he insists that this record and the recital therein is conclusive evidence of his compliance with the requirements of the law in that respect. If the entry in the minutes of the court, made in August term, 1834, is to be regarded as a complete and sufficient record of the plaintiff's naturalization, the law seems to be conclusively settled in his favor, by the case of Spratt v. Spratt, in the supreme court of the United States. Chief justice Marshall there says, "The various acts upon "the subject, submit the decision of the right of aliens to admission "as citizens, to courts of record. They are to receive "testimony, to compare it with the law, and to judge on both "law and fact. This judgment is entered on record as the "judgment of the court. It seems to us, if it be in legal form, "to close all inquiry; and like every other judgment, to be "complete evidence of its own validity. The inconvenience "which might arise from this principle has been pressed upon "the court: But the inconvenience might be still greater if "the opposite opinion be established." This decision is a binding authority upon all the state courts on a question of this kind. The principle was distinctly acknowledged and applied by the supreme court of this state in Ritchie v. Putnam, (13Wendell, 524.)
The entry in the minutes of the court of August 26, 1834, contains everything necessary to constitute the entire record of the admission of the plaintiff as a citizen. It was not necessary *Page 280 
that the evidence on which the court acted should be set forth in the record. In relation to the fact that there had been a previous declaration of intention regularly made in due form of law, the record shows it by recital without stating the proof, and this is sufficient. It was unnecessary for the plaintiff to give evidence in support of the fact recited; and incompetent for the defendant to contradict it, unless by matter of record importing equal verity. The defendants read in evidence the minutes of the same court of the 2d September, 1831, for the purpose of contradicting the recital and showing that instead of declaring his intention to become a citizen he had merely reported his arrival in the country; and if the recital in the minutes of August, 1834, had referred to the proceedings of September, 1831, as being the declaration on which the court acted in admitting the plaintiff to citizenship, the case might have presented a difficulty fatal to the validity of the naturalization. But the recital makes no such reference. It does not in any way connect itself with the previous proceeding in that court. That previous proceeding was not a necessary part of the record of naturalization.
The plaintiff may have declared his intention to become a citizen, in a different court and at a different time, and proof of such valid and regular declaration of intention may have been produced and exhibited at the time of his naturalization. The acts of congress do not require the declaration of intention to be made before the same court which afterwards admits the alien to citizenship. His declaration of intention may be made before any one of a great number of courts enumerated in the first section of the act of 1802, and in any state or territory. He is not required by this provision to declare his intention before a court of the place or of the state in which he resides, or has resided or intends to reside; and by the same section he may be naturalized before "some one "of the courts aforesaid," of a state or territory in which he has resided one year. Any one of these courts is thus authorized to receive and record his preliminary declaration; and *Page 281 
any one of these courts held in the state or territory in which the alien has resided one year, may admit him to citizenship. (Laws of the United States, 3 Bioren and Duane, 476.) Each of these courts is authorized to authenticate its proceedings in such manner as to entitle them to full faith and credit in the others. The final judgment of admission to citizenship may therefore as well be founded on the preliminary declaration made in another court as if it were made in the court where the final decision is rendered. I am aware that the court of chancery of South Carolina took a different view of this point in the case ofVaux v. Nesbit, (1 McCord Ch. R. 366.)
But that construction of the law founded on implication merely, seems to be erroneous. It would not only lead to great inconvenience in cases where aliens had changed their residence; but it would in many cases defeat the operation of the law. Where an alien had, within one year after making his preliminary declaration, removed into a different state and resided there long enough to complete a residence of five years in the United States, he would not be entitled to admission in either state. This construction creates a condition of admission (not contained in the law,) that the alien shall have resided a year in the state where he declares his intention.
The condition prescribed in the law is that he shall have resided a year in the state where he is naturalized.
The law appears evidently to have been designed to enable aliens to declare their intention to become citizens without reference to the place of their residence, and to enable them to be naturalized after five years residence in the United States, before any court of record sitting in a state in which the alien has resided one year. These provisions apply as well to aliens who have constantly resided in one place, as to those who have removed from one state or place to another.
The evidence therefore on which the court acted in 1834 in admitting the plaintiff to citizenship may have been precisely *Page 282 
what the law required without impeaching the truth of the entry in 1831. The last record is not inconsistent with the first. They do not contradict each other. We are only to presume that the plaintiff produced other evidence than that contained in the minutes of September, 1831; and that we are bound to presume, because the record of 1834 requires us to do so. We cannot therefore say that the plaintiff's naturalization was defective or invalid.