Renner agt. Müller.

would not of itself operate as a waiver of the conditions or estop the company from insisting on its breach as a bar to the recovery therein (*Grosvenor* agt. *The At. Ins. Co.*, 17 *N. Y.*, 391; *Bidwell* agt. *North Ins., Co.*, 19 *N. Y.*, 179; *Ripley* agt. *Ætna Ins. Co.*, 30 *N. Y.*, 136; *Noyes* agt. *Hartf. Ins. Co.*, 54 *N. Y.*, 668; *Van Schoick* agt. *Niag. F. Ins. Co.*, 68 *N. Y.*, 434; *Pitney* agt. *Glen's Falls Ins. Co.*, 65 *N. Y.*, 6).

There was no express waiver in the policy, nor were any facts proved outside the policy on which to found either a waiver or an estoppel. The agreement of the parties, therefore, that the policy should be void in case the interest of the assured in the policy should not be truly stated therein remained in full force and vigor.

The judgment must be reversed.

Judgment reversed, new trial granted, costs to abide the event.

---

# SUPERIOR COURT OF THE CITY OF NEW YORK.

## Magdelena Renner agt. Jacob Müller and others.

*Naturalization of alien females by marriage — Immediate inheritance of citizen representatives of deceased alien sister by passing living alien mother — Alienage of living ancestor, through whom a citizen claims, bars the inheritance — Injunction in ejectment.*

Proceedings by "*office found*" are abolished and ejectment is provided by the Code as the first remedy.

At common law and in this state, except where the statute prohibits, an alien can take an estate in fee, by purchase, and hold it against all parties except the state. But he cannot take by inheritance nor transmit by descent.

An *alien female* who comes to the United States a minor and who, before attaining full age, marries an alien, by the mere fact of marriage becomes, upon the subsequent admission of the husband to citizenship, *at once* a citizen without any declaration on her part of her intention to become such, or a previous five years' residence or the judgment of any court.

Under section 22 of chapter 2 of part 2 of the Revised Statutes, notwithstanding the deceased mother, through whom the estate is claimed, was an alien, the inheritance, to one otherwise capable of taking, is not barred.

Collateral descent from brother to the representatives of a deceased sister, the alien mother surviving, is immediate. Such alien mother cannot impede the descent; the pedigree is deduced from the brother last seized by passing by or leaving out the alien mother, she not being a *medium hereditas*.

Children of a *surviving* alien sister, though citizens, are barred, *section 22 of chapter 2, part 2 of the Revised Statutes,* applying only to the case of deceased ancestors.

*Quære,* as to the effect of the treaty of 1844, between the United States and the kingdom of Wurtemberg, relative to the rights of alien next of kin.

Where there is danger that the rents and profits of real estate will be removed out of the jurisdiction of the court in derogation of the rights of the heir, the court will enjoin such removal.

*At Special Term, February,* 1879.

EJECTMENT. Motion for injunction.

The facts are sufficiently stated in the opinion.

FREEDMAN, *J.* — This is a motion for an injunction to restrain the defendant Müller from paying over rents of real estate, situate in the city of New York, to the alien next of kin of Karl Hafner, deceased.

The action is to recover possession and the rents and profits of the property in question, from Jacob Müller, and his tenants in possession under him, and plaintiff's right to possession is founded upon the allegation that she is the sole heir of the deceased capable of taking the inheritance.

Karl Hafner died seized of the fee of the property in question and intestate, on the 19th day of January, 1874. At the time of his death he was a citizen of the United States, and an actual resident of the city and county and state of New York. At the same time the following of his blood relatives were residents of the United States, viz. :

1. The plaintiff, Magdalena Renner, a niece, the daughter

and legitimate child of his sister, Caroline Sinn, who had died July 5, 1855, leaving her surviving no other child, who, at the time of Karl Hafner's death, was a citizen of the United States.

2. Christine Müller, another niece, wife of the defendant, Jacob Müller, and the daughter and legitimate child of his sister, Christine Rosine Wieland, who then was still alive, and a resident of the kingdom of Wurtemberg.

3. Michael Wieland, a nephew, who is a brother of Mrs. Müller, and the son of Hafner's sister, Christine Rosine Wieland; and,

4. Another nephew, the son of a deceased brother, which nephew had come to the United States in the autumn of 1873.

The three first named resided in the state of New York, and the fourth in Pennsylvania.

Karl Haffner also left him surviving a mother (since deceased), two sisters, one brother, two nephews and five nieces, natives and residents of the kingdom of Wurtemberg, none of whom had ever been in this country, and all of whom were aliens.

Upon the argument, both sides agreed that Hafner's title descended, at the moment of his death, upon some one or more of his heirs at law, or, in default of heirs, escheated to the state under the statute. It could not remain in abeyance, but had to go somewhere. If there was no one ready and capable of taking it, it escheated. If, at the moment referred to, there was but one heir capable of taking, the title vested in him or her absolutely and exclusively, and no subsequent act of the legislature could divest it.

The parties differ widely, however, upon the question of the citizenship of some, and the rights, as conceded aliens, of others, of Hafner's next of kin, and the questions involved in those conflicting claims, are of such great importance as to justify a somewhat extended discussion.

The rule of the common law, as to the rights of aliens, as

stated by lord Coke, and as recognized in this state, except so far as it has been changed or modified by statute, is:

" That an alien may purchase lands, tenements or hereditaments, to himself and his heirs, and, although he can have no heirs, yet he has capacity to take a fee simple, but not to hold it. For, upon office found, the king shall have it, by his prerogative, of whomsoever the land is holden. And so it is, if the alien doth purchase land and die, the law doth cast the freehold and the inheritance upon the king. If an alien purchase any estate of freehold in houses, lands, tenements or hereditaments, the king, upon office found, shall have them " (*Co. Litt.*, 2 *b.*).

In New York, proceedings by office found, which were formerly authorized by statute (2 *R. S., p.* 586), are abolished, and ejectment is provided as the first remedy (*Code, sec.* 428).

At common law, therefore, and where no prohibitory statute is in the way, an alien can take an estate in fee, by purchase or devise, and can hold it against all parties, except the state. But he cannot take by inheritance, nor transmit by descent (*Mooers* agt. *White*, 6 *Johns. Ch. R.*, 365; *Fairfax's Devisee* agt. *Hunter's Lessee*, 7 *Cranch.*, 603; *The People* agt. *Conklin*, 2 *Hill*, 67; *Wadsworth* agt. *Wadsworth*, 12 *N. Y.*, 376; *Munro* agt. *Merchant*, 28 *N. Y.*, 9).

In New York the acquisition, tenure, alienation and descent of real property, are regulated by statute. The people of the state, in their right of sovereignty, are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the state; and all lands the title to which fails from a defect of heirs, revert or escheat to the people (1 *Rev. St.*, 718).

All lands within the state are declared to be allodial, so that, subject only to the liability to escheat, the entire and absolute property is vested in the owners according to the nature of their respective estates; and all feudal tenures of every description, with all their incidents, are abolished (*Id., sec.* 3).

Every person capable of holding lands (except idiots, persons of unsound mind and infants), seized of, or entitled to, any estate or interest in lands, may alien such estate or interest at his pleasure, with the effect, and subject to the restrictions and regulations provided by law (1 *Rev. St.*, 719, *sec.* 10).

But the capacity to hold lands, and of taking the same by descent, devise or purchase, was originally confined to citizens of the United States (*Id.*, *sec.* 8).

The chapter relative to the title of real property by descent, contains a series of canons specifically regulating the descent. It also prescribes that in all cases not expressly provided for, the inheritance shall descend according to the course of the common law (1 *Rev. St.*, 753, *sec.* 16).

It was also enacted, at an early day, that any alien who had or might come into the United States, upon making and filing with the secretary of state a deposition or affirmation in writing, that he is resident in the state, and intends always to reside in the United States, and to become a citizen thereof as soon as he can be naturalized, and that he has taken such incipient measures as the laws of the United States require to enable him to obtain naturalization, could take and hold real estate of any kind, to himself, his heirs and assigns forever, and might, during six years thereafter, sell, assign, mortgage, devise and dispose of the same, in any manner, as he might or could do, if he were a native citizen; but should have no power to lease or demise until he should become naturalized (1 *Rev. St.*, 720, *secs.* 15, 16).

It was further provided that if any such alien should die within the six years, intestate, his estate should descend to his heirs, if he have any, who are inhabitants of the United States, in the same manner as though he died a citizen of the state (1 *Rev. St.*, 720, *sec.* 18).

After the six years the alien lost all the privileges so secured, except the right to hold the estate, unless he became naturalized according to the provisions of the laws of the United States.

Vol. LVII        30

Renner agt. Müller.

The same statute, also, provided that any such alien should not be capable of taking or holding any lands or real estate which might have descended, or been devised or conveyed to him previously to his having become such resident, and made such deposition or affirmation as aforesaid (*Sec.* 17).

It has been a subject of dispute whether this seventeenth section extended to aliens, who had not complied with the provisions of the sections immediately preceding, and thus changed the common law rule, or whether it was limited to aliens who had complied with the provisions ; in other words, whether it was intended to prevent aliens from taking real estate, except upon a fulfillment of the requirements of the statutes, or only intended to prevent such aliens as did comply, from holding lands before purchased as against the claim of the state.

It has been decided in the case of *Wright* agt. *Saddler* (20 *N. Y.*, 320), that that section did not impair the common law rule, but merely prevented those who should place themselves within the statute, from holding such lands as they had before purchased, as against the state.

By subsequent enabling acts, viz. : Chapter 171 of the Laws of 1830 ; chapter 87 of the Laws of 1843 ; chapter 115 of the Laws of 1845 ; chapter 576 of the Laws of 1857; the capacity of resident aliens to hold and convey real estate was still further extended.    Time and space do not permit any extended reference to them.

A passing notice should be taken, however, of the act of 1845, as the most important of them.    By that act a resident alien was not only empowered to take by purchase or devise, upon making and filing the deposition or affirmation required by the former statutes, but it was also expressly provided that, upon making and filing such deposition or affirmation, he might hold all real estate previously granted, conveyed or devised to him in the same manner and with the like effect as if he at the time of such grant, conveyance or devise, had been a citizen of the United States.    Provision was also made

for the right of dower of the wives, and the rights of the grantees and devisees of alien residents of this state. By the fourth section even alien heirs of resident aliens were made capable in certain cases and upon compliance with certain conditions to take and hold by descent.

The section last referred to has been amended by chapter 261 of Laws 1874 and chapter 38 of Laws 1875, so as to enable aliens to take lands by descent from naturalized or native citizens as well as from resident aliens. But as these amendments were made after Hafner's death, and consequently after the rights of all parties had become fixed, they may be at once dismissed. For the same reason chapter 111 of Laws of 1877, which seems to be an amplification of chapter 336 of Laws 1875 and of chapter 513 of Laws 1868, need not be considered. The three last named statutes simply relate to the confirmation of the title of citizens which may be questioned by reason of the alienage of former owners.

At the time of Hafner's death, therefore, the law was that none but a citizen could inherit a fee by descent from a citizen ancestor. To this extent the common law, which upon this point rests upon the policy of the feudal law, still prevailed notwithstanding the abolition of all feudal tenures.

I now proceed to consider the objections which have been urged against plaintiff's claim, and especially against her standing in court.

I. The first objection is, that, at the time of Hafner's death, the plaintiff was an alien.

It appears that she was born in the kingdom of Wurtemberg on the 20th of September, 1853; that her parents never resided in, and never were, citizens of the United States; that she came to the United States in 1869; that, consequently, at the time of Hafner's death, she had not resided five years within the United States, nor had she arrived at the age of twenty-one; and that she had not, at that time, declared her intention to become a citizen, nor had she been admitted to citizenship by the judgment of any court.

If these were all the facts, the charge of alienism would be well founded, and plaintiff would have no standing in court, for none of the statutes, in force at the time of Hafner's death, and above referred to, is of any avail to the plaintiff, for the reason that Hafner did not die as a resident alien, but as a citizen, and the plaintiff had, at the time of his death, neither filed the deposition or affirmation required by the laws of New York, nor declared her intention to become a citizen of the United States pursuant to the acts of congress. Even if the premises in question had been devised to her by will, she could not, upon the facts and the law so far considered, have taken them, for the statute relating to wills and the distribution of estates provides that "every devise of any interest in real property to a person who, at the time of the death of the testator, shall be an alien, not authorized by statute to hold real estate, shall be void. The interest so devised shall descend to the heirs of the testator; if there be no such heirs competent to take, it shall pass under his will to the residuary devisees therein named, if any there be, competent to take such interest " (2 *Rev. St.*, 56, *sec.* 4).

Moreover it is well settled that a statute which merely authorizes an alien to take and hold real estate by purchase or devise, does not change the general law of descent.

According to the common law of this country it is not enough that a person is in the order of succession prescribed by statute, as required to take lands by descent, upon the death of the owner thereof intestate. He must also be a citizen of the United States at the time of the death of the intestate. He cannot qualify himself to inherit by becoming a citizen afterward. This disqualification does not rest upon a lack of inheritable blood, though that expression frequently occurs in the books, but, as shown by Mr. Bingham on Descents, upon a lack of right to inherit for the reason that the alien is not a citizen or a subject of the government where the land lies. The inheritance itself is made up of a right to the possession and use of certain land, which right is derived from a

Renner agt. Müller.

grant or contract of the state. Hence, where by the law of the state, a person who is not a citizen, cannot be a party to such a grant or contract, he fails to inherit merely from lack of legal capacity to become a party to such grant or contract. And at common law the citizen encounters the same difficulty when he finds that his right of succession must come from the intestate, not directly or immediately, but indirectly and mediately through some alien relative deceased before the intestate. In the latter case the difficulty has been removed by statute ; in the former the disqualification still exists.

It is claimed, however, on the part of the plaintiff, that by virtue of her marriage with Michael Renner she became a citizen of the United States by force of the second section of the act of congress, passed February 10, 1855.

Michael Renner came to the United States in 1865 and has ever since that time resided here. On June 4, 1871, at the city of New York, he and the plaintiff were married, and on October 10, 1873, he was, on his application, duly naturalized and admitted to citizenship.

The acts of congress, relative to the naturalization of aliens require, among other things, as conditions precedent to admission, an application in a certain prescribed manner and proof of a residence of five years within the United States. Even minors, on arriving at the age of twenty-one, must, as a general rule, comply with these conditions before they can become citizens. This is the general policy of the law. Prior to 1855 exceptions were made in favor of :

1. Resident children of persons duly naturalized, being under the age of twenty-one years at the time of the naturalization of their parents.

2. Children of certain citizens, though born out of the limits and jurisdiction of the United States ; and,

3. The widow and children of aliens dying during the interval between their application and actual naturalization.

The persons falling within either of the first two classes, are considered citizens of the United States without a formal

application for admission, and those falling within the third class upon taking the oaths prescribed by law.

By the second section of the act of 1855 it was provided :

"Any woman who might lawfully be naturalized under the existing laws, married, or who shall be married, to a citizen of the United States, shall be deemed and taken to be a citizen."

It was held by the court of appeals in *Burton* agt. *Burton* (1 *Keyes*, 373), that the words "who might lawfully be naturalized under the existing laws," were only a limitation of the application of the section to a class of persons, viz. : to white women, and hence it was determined that an alien woman who had married a citizen, but who had never been in the United States, became, by the act of marriage, a citizen, and that such act stood in the place of all the requirements demanded by the naturalization laws.

The defendants insist that the plaintiff does not come within this decision, because at the time of her marriage with Michael Renner, the latter was not a citizen, though he became such afterwards.    This ˑprecise point came up in *Kelly* agt. *Owen* (7 *Wall.*, 496), in which case the supreme court of the United States, approving the doctrine of *Burton* agt. *Burton*, held as follows :

"As we construe this act, it confers the privileges of citizenship upon women married to citizens of the United States, if they are of the class of persons for whose naturalization the previous acts of congress provide.    The terms 'married,' or 'who shall be married,' do not refer, in our judgment, to the time when the ceremony of marriage is celebrated, but to a state of marriage.    They mean that whenever a woman who under previous acts might be naturalized, is in a state of marriage to a citizen, whether his citizenship existed at the passage of the act or subsequently, or before or after the marriage, she becomes, by that fact, a citizen also.    His citizenship, whenever it exists, confers, under the act, citizenship upon her.    The construction which would restrict the act to women whose husbands, at the time of marriage, are

citizens, would exclude far the greater number, for whose bene-fit, as we think, the act was intended. Its object, in our opinion, was to allow her citizenship to follow that of her husband, without the necessity of any application for naturalization on her part; and, if this was the object, there is no reason for the restriction suggested. The terms, "who might lawfully under the existing laws," only limit the application of the law to free white women * * *."

The defendants also contend that the plaintiff does not come within the decision of either of the two foregoing cases, because on the day of Hafner's death she was not twenty-one years of age, and for that reason could not, on that day, have been naturalized under the laws existing prior to the act of 1855. This objection has no greater force, if as much, than the objections urged against Mrs. Burton. The plaintiff was no more incapacitated on that account, than Mrs. Burton was by reason of non-residence. Indeed she was not so much, for, if necessary, she could confessedly have become naturalized under the naturalization acts within a few months after Hafner's death, while Mrs. Burton could not for five years after her husband's death. Age of twenty-one years, under the then existing laws, was simply one of the qualifications necessary for an applicant to have, just as it was necessary for him to show a five years' residence. The plaintiff comes clearly within the reasoning, if not the letter, of the two decisions. The statute says, "any woman," and not "any woman of twenty-one years of age." There is no more reason, in considering the general policy of the natural-ization laws, why, in case of marriage with a citizen, the requirement of twenty-one years of age should not be dis-pensed with, than the requirement of a five year's previous residence. They are both made requirements for the pur-pose of furnishing evidence of fitness to undertake the duties and responsibilities of citizenship, and one is no more important or necessary than the other. The fact of mar-riage furnishes evidence of such fitness, and the law says that

a woman who is capable of lawfully entering into the marriage relation, and does so, marrying a citizen, is fitted to become, and, *ipso facto*, becomes a citizen. The duties are no more onerous upon her than upon a native female of the same age, and she is still under the same disabilities. Her naturalization simply removes the disability resting upon alienism, and throws around her the protection of the nation. The propriety of this may be urged as a cogent reason in support of such a construction to the act as will give to the wife of the citizen the same protection as it gives to him and to their children. She has linked her destiny with the country by the strongest of ties. Citizenship does not depend upon age. To be qualified as a voter, a citizen must be of the age of twenty-one years, and upwards. On the other hand, infants may be citizens by birth.

I repeat, therefore, that there is nothing in the general policy of the naturalization laws which requires such a construction of the act of 1855 as will exclude the wife of a citizen from citizenship, either, because at the time of the marriage she was an alien, or because her husband was an alien, if he subsequently became a citizen, or because she had not resided five years within the United States, or was under twenty-one years of age.

All that is necessary is a valid marriage with a citizen, or one who subsequently becomes such, and that presupposes lawful capacity to contract it. At common law the age of legal consent is fourteen in males and twelve in females, and this rule is still in force in New York.

II. Defendants' second objection to plaintiff's claim is, that, even if at the time of Hafner's death the plaintiff was a citizen, she was incapable of inheriting for the reason that her mother, a sister of the intestate, through whom she must trace her descent, was an alien. That the latter always was, and in July, 1855, died, an alien, is conceded.

The objection is obviated, however, by section 22 of chapter 2 of part 2 of the Revised Statutes, which provides that

no person capable of inheriting under the provisions of the said chapter, shall be precluded from such inheritance by reason of the alienism of any ancestor of such person ( 1 *Rev. St., p.* 754, *sec.* 22).

This section is a modification of the common law rule that no person can inherit who is compelled to trace his title through an alien ancestor, and it removes the incapacity which, but for its existence, would attach to the plaintiff.

The word "ancestor," as used in this statute, has been made the subject of much discussion whether it should be construed to mean lineal ancestors only, or whether collateral ancestors were also intended, and it was finally held to embrace both lineal and collateral ancestors. They are ancestors of the estate, not of the blood (*McCarthy* agt. *Marsh*, 5 *N. Y.*, 263).

III. Defendants' third objection to plaintiff's claim is, that the fact that the mother of Karl Hafner, at the time of his death, was alive and an alien, impeded the descent to plaintiff's mother, and that the plaintiff has no better claim than her mother would have had, if she had been alive and capable of inheriting at that time. It must be conceded that under the canons of the statute of descents the plaintiff, as a citizen, can only succeed, if at all, as the representative of her deceased mother, and that in this aspect of the case she must claim through her mother. But this she can do successfully.

It was held in *Jackson* agt. *Green* (7 *Wend.*, 333), that, at common law, one brother could inherit of another, though the father was an alien. And it is said : " Collateral descent from brother to brother is immediate, taking no notice of the father, but from uncle to nephew, or nephew to uncle, the descent is mediate, the father being the medium through which the descent must pass. Hence one brother may inherit from another, though the father be an alien, or attainted; but a grandson cannot inherit from his grandfather, the father having died in the life of the grandfather, provided the father was an alien, or attainted; but the land shall escheat."

Renner agt. Müller.

It has become a maxim of the law that, as between brothers, a father, although a *medium sanguinis*, is not a *medium hereditatis* (*Parish* agt. *Ward*, 28 *Barb.*, 328).

It has also been decided, that the rule which enables brothers, sons of an alien father, to inherit of each other, because the descent between them is immediate, applies, also, between one of the brothers and the representative of the other, and also between the representatives of both of them (*McGregor* agt. *Comstock*, 3 *N. Y.*, 408; *McCarthy* agt. *Marsh*, 5 *N. Y.*, 274; *Smith* agt. *Mulligan*, 11 *Abb.* [*N. S.*], 438).

Under the laws of New York sisters stand upon the same footing as brothers, and hence the descent is also immediate between brothers and sisters. This being so, it follows that if an alien father cannot impede the descent between them, or their representatives, the same rule, as between them, must apply in the case of an alien mother. The fact, therefore, that at the time of Hafner's death his mother was alive and an alien, can constitute no obstacle to inheritance between such of Hafner's brothers and sisters, or their representatives, as are otherwise capable and entitled to inherit.

The rule laid down by chancellor KENT, that "if a citizen dies and his next heir be an alien who cannot take, the alien cannot interrupt the descent to others, and the inheritance descends to the next of kin who is competent to take, in like manner, as if no such alien had ever existed" (2 *Kent*, 56), applies to all cases in which the claimant does not make title through the alien, but where he or she can deduce his or her pedigree from the person dying seized, by leaving out or passing by the alien. Hafner's mother may, therefore, be left out and passed by; and his sister (plaintiff's mother) having died before him, and the impediment which her alienism would have otherwise presented, having been obviated by statute, the plaintiff labors under no disqualification.

IV. Defendants' fourth objection to plaintiff's claim is, that even if the preceding three objections were untenable and the plaintiff were competent of taking by descent, she

would not be sole heir, but that Christine Müller, another niece, and Michael Wieland, a nephew of the deceased, would be entitled to share with her, and for this reason, if no other, she cannot maintain ejectment as sole heir. Christine was married to the defendant, Jacob Müller, in the city of New York, in the year 1862, and at the time of such marriage was twenty-two years of age. In 1863, Jacob Müller, became a citizen of the United States, and thereupon, under and by virtue of the act of 1855, here inbefore considered, his wife also became a citizen. It does not appear whether Michael Wieland was ever admitted to citizenship, nor is the fact material. The difficulty in the claim of both Christine Müller and Michael Wieland is, that, though residents of New York at the time of Hafner's death, they were the children of Christine Rosina Wieland, a sister of the intestate, who, at the time of the death of the intestate, was alive and an alien. As to them, therefore, even if they were citizens, the twenty-second section of Revised Statutes (*page* 754), does not apply. That section was taken substantially from the 11th and 12th William III, chapter 6, and this has always been understood to apply only to the case of a deceased, not of a living, ancestor.

In *McCreery's Lessee* agt. *Somerville* (9 *Wheat.*, 354), which arose in Maryland under a statute substantially like the provision of the English act, the statute was construed in the same way.

So it has been held under the statute of New York that that did not enable a citizen to take by descent as the representative of an alien parent alive at the death of the intestate (*The People* agt. *Irwin*, 21 *Wend.*, 128; *McLean* agt. *Swanton*, 13 *N. Y.*, 535).

These cases have settled the law to be that when, in the course of descent, a title comes to an alien living, who, but for his alienage, would have been the heir, it will not pass through him, but will pass by him to the next one who is competent.

V. The defendants finally insist that the alien next of kin are entitled to take, by descent, by virtue of the treaty of 1844, made between the United States and the kingdom of Wurtemberg, the said alien next of kin being subjects of that kingdom. That treaty allows subjects or citizens of either party to whom lands would have descended under the laws of the other, but for their alienage, a term of two years to sell the same and to withdraw the proceeds thereof without molestation. It also provides that the said term may be reasonably prolonged according to circumstances. More than five years having already elapsed since Hafner's death, and the defendants having failed to show a prolongation of the term, it may be a serious question whether the alien claimants are still within the protection of the treaty, or whether, if they once lost it, they have any remedy left, for the treaty makes no provision as to the manner or means in or by which the prolongation may be applied for or granted, and it may well be that in the absence of appropriate legislation upon the subject, that part of it which calls for a reasonable prolongation, remains a dead letter. The plaintiff also contends that the treaty, as a whole, has been impliedly abrogated. Upon reflection I have come to the conclusion that these as well as all other questions arising upon this branch of the case, should be reserved for the trial of the issues. For the purposes of the present motion it is sufficient to say that the rights of the alien claimants, in that respect, are not clear.

It appearing, then, that, aside from the questions arising under the treaty, all the objections against plaintiff's claim are unfounded ; that under the laws of this state, the title to the property in question descended at the time of Hafner's death to the plaintiff as the only heir competent to take it, and that there is danger that the rents and profits of such property may be removed, by the defendant, Jacob Müller, beyond the jurisdiction of this court and of this state, the plaintiff has shown enough, according to well settled rules of law, to entitle

her to an injunction restraining such removal during the pendency of the action.

The motion for the continuance of the injunction during the pendency of the action must be granted, with ten dollars costs to abide the event. Order to be settled on notice.